**Douglas L. ADAMS and Gary M. Piccirillo, Plaintiffs-Appellants,**

**Ronnie McKane, et al., Plaintiffs,**

v.

**Rodrick JAMES, Henry Ziegler, Jr., Don Merritt, J.F. Tompkins, and Louie L. Wainwright, Defendants-Appellees.**

No. 85–3294.

United States Court of Appeals, Eleventh Circuit.

March 18, 1986.

Steven Seliger, Quincy, Fla., for plaintiffs-appellants.

Douglas B. MacInnes, Walter M. Meginniss, Asst. Atty. Gen., Tallahassee, Fla., for defendants-appellees.

Before HATCHETT and CLARK, Circuit Judges, and ALLGOOD *, Senior District Judge.

HATCHETT, Circuit Judge:

Does a prison inmate have a constitutional right not to be transferred from a job as law clerk because it deprives other inmates of the law clerk's legal services? Or, stated otherwise, may a "jailhouse lawyer" interpose the interests of other inmates to block an action by prison officials, if it will make the jailhouse lawyer less available to help the other inmates to file grievances or lawsuits? In *Bridges v. Russell*, 757 F.2d 1155 (11th Cir.1985), this court held open the question whether the first amendment encompasses a prisoner's asserted right to assist other inmates in filing grievances. In this case, the district court held that depriving other inmates of services by

transferring a prison law clerk would not infringe the law clerk's first amendment rights. We affirm on that issue, but remand for consideration of other legal theories the plaintiffs sought to put before the district court.

Douglas L. Adams and Gary M. Piccirillo were inmate law clerks at Polk Correctional Institute (Polk), an institution in the Florida State Prison System. West Publishing Company had trained them as law clerks.

At the peak of their activity as inmate law clerks, Adams and Piccirillo and two other law clerks assisted an average of 400 inmates a month with legal problems. They also conducted classes to teach legal skills to other inmates.

This dispute centers on the dismissal of Adams and Piccirillo from their jobs as law clerks and their later transfer to Union Correctional Institution (UCI), which for purposes of this opinion we deem a more punitive institution. The events leading to their dismissal began with a letter typed by Adams to news outlets about one of Adams's cases. Roderick James, educational supervisor at Polk, intercepted the letter and thereafter informed all the law clerks that letters to the media could not be typed on law library typewriters and that law clerks could not help inmates complete DC77 complaint forms (administrative appeals).

Soon after, Adams and Piccirillo discovered copies of case papers they had mailed for another inmate on the desk of their supervisor, Henry Ziegler, Jr. Piccirillo removed the papers. Ziegler immediately ordered Adams and Piccirillo to accompany him to the office of Don Merritt, the classification supervisor at Polk. When the group arrived at Merritt's office, he dismissed Adams and Piccirillo from their jobs as law clerks. Merritt assigned Adams to the prison cabinet shop and assigned Piccir-

---

* Honorable Clarence W. Allgood, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

illo to be a dorm orderly. No reasons for the reassignments were given.

Both Adams and Piccirillo filed administrative appeals of their dismissals. Each was denied without a reason. Adams and Piccirillo were eventually denied access to the prison library.

On August 18, 1982, prison officials transferred Adams and Piccirillo to Union Correctional Institution. The reason given was to relieve overcrowding at Polk.

Prison officials have offered explanations for their removal of Adams and Piccirillo from their duties as law clerks and for their transfer to UCI. Merritt stated that he transferred Adams to alleviate the cost burden of filling Adams's many requests (2,000 to date) for documents not available in Polk's "minor law library." Ziegler states that he and James suspected Adams and Piccirillo of charging for their services to other inmates, sabotaging prison typing equipment, and violating policy and procedure by sending written requests to outside sources, such as the Florida State University Law Library in Tallahassee. Ziegler further stated that Adams's and Piccirillo's "behaviors are very anti-institutional ... making their continuance as inmate law clerks less than desirable and even counter-productive."

The district judge granted the appellees' motion for summary judgment under Rule 56, Federal Rules of Civil Procedure. In reviewing a summary judgment, we subject legal conclusions to "the same standard of appellate review as any question of law raised upon appeal." *Morrison v. Washington County, Alabama,* 700 F.2d 678, 682 (11th Cir.1983). On a question of law our review is plenary. *See Federal Deposit Insurance Corp. v. Dye,* 642 F.2d 837, 841 (5th Cir.1981). We view any inferences to be drawn from the evidence in the light most favorable to the party opposing the motion. *Bingham Ltd. v. United States,* 724 F.2d 921, 924 (11th Cir.1984).

The first basis for the district court's dismissal of Adams's and Piccirillo's claims was the principle that prison inmates do not have a constitutionally protected right to remain at a particular penal institution, Fla.Stat. § 945.09(3); *see Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). The district court also ruled that inmates do not have an expectation of keeping a certain job, *cf. Gibson v. McEvers,* 631 F.2d 95, 98 (7th Cir.1980) (citing *Altizer v. Padernick,* 569 F.2d 812, 813 (4th Cir.1978)); *Bryan v. Werner,* 516 F.2d 233 (3d Cir.1975).

These conclusions are correct. Prison administration requires a flexibility that cannot be burdened by the accumulation of expectations about the situations in which prisoners are placed temporarily. The due process clause does not "in and of itself protect a duly convicted prisoner against" a change of status. *See Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976) (transfer from one institution to another within the state prison system).

An assignment to the job of law clerk does not invest an inmate, or those he assists, with a property interest in his or her continuation as a law clerk. Despite the aspect of property in the accumulation of experience and intellectual capital by the inmate law clerk, job assignment and reassignment remain the prerogative of the prison administrators. A routine reassignment of an inmate law clerk does not enable an inmate to state a claim in federal court. This is true despite the nexus between a law clerk's primary activity and other constitutional rights retained by inmates, such as the right of free speech, and the right of access to court. *See Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *compare Hoppins v. Wallace,* 751 F.2d 1161 (11th Cir.1985) (reasonableness of limitation on affirmative assistance to litigious inmate).

Adams and Piccirillo, however, have constitutional rights independent of any asserted property interest in being law clerks. Prisoners retain constitutional protections despite the necessary restrictions

on their rights and privileges. *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). The lack of entitlement to a particular privilege does not free prison administrators to grant or withhold the privilege for impermissible reasons. The doctrine of unconstitutional conditions prohibits terminating benefits, though not classified as entitlements, if the termination is based on motivations that other constitutional provisions proscribe. *See Thomas v. Review Bd.,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

This court has applied the unconstitutional conditions doctrine to prisoner suits. In *Bridges v. Russell,* 757 F.2d 1155 (11th Cir.1985), a prisoner's allegation that he was transferred to another prison in retaliation for his exercise of first amendment rights of free speech was held to require factual resolution. In *Hall v. Sutton,* 755 F.2d 786 (11th Cir.1985), an allegation of a constitutionally improper retaliatory motive for the taking of tennis shoes enabled an inmate to avoid the rule of *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), that an intentional deprivation of property does not violate due process if an adequate state procedure exists to redress the deprivation.

Similarly, the Seventh Circuit has applied independent constitutional scrutiny to a prison's assignment of cellmates. The court held that, although prisoners have no valid expectation of a cellmate or job of their own choosing, an inmate's charge that the prison had a policy of segregating black from white inmates in cell and job assignments stated a claim for which relief could be granted. *Harris v. Greer,* 750 F.2d 617 (7th Cir.1984).

The district court also concluded that Adams and Piccirillo lacked standing to state a constitutional claim because they were complaining about the deprivation their removal as law clerks imposed on other inmates.

In *Bridges v. Russell,* this court left open the question whether the first amendment encompasses an inmate's asserted right to assist other inmates in filing grievances. *Bridges,* 757 F.2d at 1157. In *Bridges,* speech personal to the inmate constituted part of the conduct for which he alleged he had been assigned to a more punitive prison. This allegation was sufficient to require remand.

■ In one view, Adams and Piccirillo are simply asserting other inmates' right of access to the courts. In this view, other inmates still have legal assistance available through replacement clerks, and Adams and Piccirillo may not assert whatever interest other inmates have in being assisted by them rather than someone else. This is the district court's view, and we affirm that view.

On appeal, Adams and Piccirillo insist that they raised claims urging their own first amendment rights in the district court, but the district court misunderstood their position; consequently, they have been denied relief.

It is important that we review the case presented to the district court rather than a better case fashioned after the district court's order. The problem we face is that it is difficult to discern the exact theories on which the appellants proceeded in the district court.

The district court found: "Plaintiffs have no personal stake in the other prisoners' rights to access to the courts, and, have no standing on this issue." In this non-class-action lawsuit, the district court has answered the question left open in *Bridges* in the negative. We agree. In a non-class-action context a prisoner has no standing to litigate another prisoner's claim of denial of access to the courts. *Contra Buise v. Hudkins,* 584 F.2d 223, 227 (7th Cir.1978) (arguing that the Supreme Court allowed an inmate writ writer to raise fellow inmates' right of access to court to attack a general prohibition of writ writing and applying the precedent to an individual claim that an inmate's transfer violated other

inmates' access to court if state did not show alternative access. Citing *Johnson v. Avery*, discussed below).

But the above conclusion is not the end of the matter. Adams and Piccirillo, on appeal, argue that they pleaded and sought to assert in the district court a first amendment right personal to them, a right other than the right to hold a particular job or to be assigned to a particular institution. The pleadings are broad enough to encompass such a theory, but that theory was not ruled on in the district court. We decline the invitation to rule on such a theory without development before the district court.

The Seventh Circuit in *Buise v. Hudkins*, 584 F.2d 223 (7th Cir.1978), has outlined the analysis that courts must make when faced with the assertion that a prisoner has suffered retaliation because of the exercise of a protected right.

■ Several legal principles regarding prisoner writ writing are well established. A prisoner has a right to be his own jailhouse lawyer. *Sigafus v. Brown*, 416 F.2d 105 (7th Cir.1969). Likewise, a prisoner has the right to assistance from other inmates. *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969).

■ The personal right of an inmate to express ideas, either through the medium of speaking and writing or through "public interest" litigation, is harder to describe in the abstract. Associational rights are necessarily curtailed by imprisonment. *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). Yet some expression by inmates will be found to be at the core of the protections of the first amendment. Litigation undertaken in good faith by a prisoner motivated to bring about social change and protect constitutional rights in the prison is a "form of political expression" and "political association" much as the Supreme Court has held litigation to be for certain organizations outside the prison setting. *See NAACP v. Button*, 371 U.S. 415, 419, 431, 83 S.Ct. 328, 330–31, 337, 9 L.Ed.2d 405 (1963) (NAACP); *In Re Primus*, 436 U.S. 412, 428, 98 S.Ct. 1893, 1902–03, 56 L.Ed.2d 417 (1978) (ACLU). A properly stated first amendment claim by an inmate does not fail simply because the allegedly protected activities were conducted on behalf of others. The right of free expression is cherished for its force as an agent of social change and not only as a right of self-interested individuals.

■ In a prison, of course, first amendment rights are not absolute. *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Legitimate policies and goals of the correction system may justify restrictions limiting prisoners' associational rights. 417 U.S. at 821. Also, principles from outside the prison context could deprive an inmate of a credible first amendment claim. For instance, undisputed evidence that Adams and Piccirillo were charging for their services as law clerks would undermine, if not eliminate, any personal first amendment claim. *See In Re Primus*, 436 U.S. at 428–30, 83 S.Ct. at 335–36. These considerations—the legitimate prison policies and the substantiality and good faith of an inmate's associational activity—are the ones that would be relevant to whether a prisoner stated a personal first amendment claim.

To summarize, we have stated three propositions concerning "jailhouse lawyering."

First, an inmate may not oppose a change of circumstance because it will harm another inmate or other inmates who have used or wish to use the inmate's services. One or more inmate's preferences for a particular prison lawyer has no bearing on the administrative authority of prison officials over a prison lawyer's personal situation. We do not adopt the Seventh Circuit's view that the Supreme Court's willingness in *Johnson v. Avery* to hear an inmate's challenge to a blanket prohibition on writ writing entitles one identifiable inmate to raise the right of other inmates to a continuation of that inmate's services unless the state affirmatively shows alternative access. *See Buise*, 584 F.2d at 227–29.

To do so would obliterate the principle that prison officials control prison job assignments, cell assignments, and the like and would introduce a property interest akin to a lawyer's in the practice of law.

Second, prison officials may not retaliate against an inmate for exercising a constitutionally protected right. Since prisoners retain some first amendment rights, a claim that prison officials retaliated for the exercise of a personal first amendment right states a claim. *See Bridges*, 757 F.2d 1155.

■ Third, in a prison, first amendment rights are identified by balancing the right asserted against the need of the prison for discipline. This is admittedly the most difficult of the propositions to state as applied to an instance of prison discipline. Most authority that establishes the limited nature of first amendment rights in prisons deals with the easier problem of restrictive regulations. *See, e.g., Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495. In a discipline case, the district court must assess whether the specific activities of a prisoner deserve classification as a protected form of expression.

Some activities of prisoners are indisputably at the core of values protected by the first amendment, even if they are undertaken on behalf of others.[1] For example, if a prisoner living in a heated wing of a prison should write a newspaper protesting the lack of heat in another wing of the prison, the activity would be a protected one. *See Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Yet we recognize the evils associated with prison writ writing, discussed by Justice White in *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (dissenting). Not every instance of prison writ writing can be said to lie at the core of first amendment protected activities.[2]

Even though *Johnson* establishes that prison officials do not have the authority to prohibit writ writing, it does not follow that every time a prisoner aids in the preparation of a writ, the act of doing so gives the prisoner first amendment rights and renders the exercise of prison authority suspect.[3]

As with any balancing test, the guidance to the district court is less certain than if the principle can be stated absolutely. Nevertheless, the district court should be

1. In speaking of the core of the first amendment protected values, we have in mind the function of the first amendment as an engine of social and political change. *See, e.g., De Jonge v. Oregon*, 299 U.S. 353, 365, 57 S.Ct. 255, 260, 81 L.Ed. 278 (1937) (describing importance of first amendment rights to process of obtaining change by peaceful means).

2. We recognize that we are in effect suggesting that the motive of a prisoner claiming a first amendment associational freedom will bear upon whether the court finds that a claim has been stated. The Supreme Court has drawn a similar line in the case of regulation of professional solicitation and has also conceded that "the line, based in part on the motive of the speaker and the character of the expressive activity, will not always be easy to draw." *In Re Primus*, 436 U.S. 412, 438 n. 32, 98 S.Ct. 1893, 1908 n. 32, 56 L.Ed.2d 417. We agree with the court's conclusion that the difficulty of drawing the line "is no reason for avoiding the undertaking." *Primus* at 438 n. 32, 98 S.Ct. at 1908 n. 32.

3. The dissent errs when it states that the majority and the district court misunderstood *Johnson*

*v. Avery*. The district court, concerned about the availability of assistance for other inmates, found, and stated in the order:

> Plaintiffs' first amended complaint clearly states that there were four inmate law clerks available, and that *after Plaintiffs' transfer, two remained in those positions. This is not a class action and there has been no allegation that other inmates at Polk Correctional Institution were denied the use of the law library or assistance of the remaining law clerks.* Plaintiffs have no personal stake in the other prisoners' rights to access to the courts, and, have no standing on this issue. [Emphasis added.]

Because other law clerks are available—as the district court found and as Adams and Piccirillo alleged—the principles of *Johnson v. Avery* are not implicated in this case. Our decision concerns only what personal rights a prisoner may raise in opposition to being transferred. Our holding does not bear upon a facial challenge, like that in *Johnson v. Avery*, to a prison policy that denies or obstructs the access of prisoners to the courts. We simply hold that the status of "jailhouse lawyer" does not give such an inmate special insulation from routine transfers and reassignments.

able to determine whether a prisoner has pleaded facts that, in light of the limitations on prisoner's first amendment rights, state a claim that prison officials have retaliated for the exercise of core first amendment rights.

We affirm in part and remand to allow the appellants to identify the personal constitutional right they have pleaded and for the district court to rule on that theory.

**AFFIRMED IN PART AND REMANDED.**

CLARK, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's decision to remand the First Amendment claim to the district court for further proceedings. I write to set forth my understanding of the First Amendment interest at stake in this case. I dissent from the majority's decision to address appellants' claim that they have standing to challenge the appellees' actions on the ground they have denied other inmates adequate access to the courts. As appellants have not preserved this claim on appeal, it is not appropriately addressed by us. Because the majority has nonetheless discussed the issue, I must also express my view that the holding reflects an erroneous and unsupported view of the law.

I. *First Amendment Claim*

The majority apparently acknowledges that the activities undertaken by a jailhouse lawyer in assisting another inmate may be protected by the First Amendment, even if the jailhouse lawyer has no personal stake in the grievance. I agree with the majority that not every instance of prison writ writing is protected by the First Amendment. "[A] prison inmate retains [only] those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). "[T]he State may impose reasonable restrictions upon the acknowledged propensity of prisoners to abuse ... the giving ... of assistance." *Johnson v. Avery*, 393 U.S. 483, 490, 89 S.Ct. 747, 751, 21 L.Ed.2d 718 (1969). But, in the absence of a legitimate penological or administrative reason for restricting the activities of a jailhouse lawyer, prison officials may not interfere with such activities. Simply stated, prison officials may not retaliate against an inmate because he or she assists other inmates in resolving legal problems without running afoul of the first amendment.

I agree that "[l]itigation undertaken in good faith by a prisoner motivated to bring about social change and protect constitutional rights in the prison" lies obviously at the core of values protected by the First Amendment. Maj.Op. at 1081 and 1082. Other legal activities are also protected by the First Amendment so long as they are conducted in a manner that is consistent with legitimate penological objectives. If general population inmates are allowed to associate with one another for some part of the day and one inmate spends this time helping another inmate to solve a legal problem, whether that problem involves unconstitutional prison conditions, habeas corpus, prison disciplinary proceedings, divorce, a tort action, sentence reduction, parole or an administrative appeal, prison officials may not punish the inmate solely because he or she has provided such assistance.

Neither may prison officials punish the jailhouse lawyer or restrict his or her activities as such because the legal proceeding sought by the jailhouse lawyer causes the kinds of problems for prison administration that legal proceedings typically cause for parties. Avoiding or sabotaging a prison conditions suit is not a legitimate penological objective. The belief that a law suit is frivolous or maliciously undertaken does not justify official interference with the jailhouse lawyer, for frivolousness and good faith are concerns of the courts and not the prison administration. *Ex Parte Hull*, 312 U.S. 546, 549, 61 S.Ct. 640, 642, 85 L.Ed.2d 1034 (1941).

Moreover, the motivation of the jailhouse lawyer is irrelevant to the existence of a First Amendment right in speaking and associating with other inmates to render legal assistance. Since prisoners' First Amendment interests are defined in terms of the legitimate policies of prison officials, there is no need to examine anything but the effect of objective behavior on prison administration in determining whether a First Amendment interest exists. Prison administrators may place reasonable restrictions only on those outward manifestations of the jailhouse lawyer's motivation that present problems for legitimate prison administration and discipline. For instance, prison officials may prohibit jailhouse lawyering for a fee, not because charging a fee reveals a state of mind that is not protected by the First Amendment, but because officials may have a legitimate administrative reason, such as preventing extortion, for prohibiting fee charging.

I see no benefit to be gained by limiting First Amendment protection to properly motivated activities, even if we could describe the kind of motive that warrants First Amendment protection. Rather, the motivation test requires the court to draw a line that is difficult, if not impossible, to discern. Difficulty is a very good " 'reason for avoiding the undertaking' " when the undertaking serves no purpose and is not required by precedent. *See* Maj.Op. supra 1082 n. 2 (quoting *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978)). *Primus*, cited by the majority, involved the problem of balancing the First Amendment interest of civil rights attorneys in pursuing social reform goals against the established interest of the state in regulating solicitation by attorneys. Motivation was relevant to whether the civil rights attorneys were merely soliciting clients and therefore subject to regulation. *Id.* at 438–39 & n. 32, 98 S.Ct. at 1908 & n. 32. No such inquiry is necessary in this case. In the absence of some basis for limiting First Amendment protection to properly motivated expression and association, we ought not muddy the First Amendment inquiry by imposing such a limitation.

I appreciate that it may be difficult to define the contours of First Amendment restrictions on official action in the prison context. To some, it may seem anomalous that a person who has displayed disrespect for the rights of others retains any claim to the protection of individual rights. Yet, inmates retain some constitutional protections. *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). Inmates also retain the right to invoke the protection of many state and federal laws if they can get their claims before the courts. At the same time, the state wields tremendous power as custodian. I can well imagine that the difficulties of managing a prison—a miniature society—make abuse of state power a constant temptation. Defining the First Amendment rights of inmates in terms of the legitimate interests and policies of prison administrators affords inmates some protection against such abuse while ensuring that prison officials will never be thwarted in any legitimate attempt to further penological policy or maintain prison discipline. Prison administration will not be balanced against the First Amendment because the interest in prison administration eliminates the First Amendment right. The First Amendment offers little enough protection to inmates without further restricting it to certain types of legal issues raised by persons motivated by the right concerns.

Thus, the jailhouse lawyer who alleges that prison officials have restricted his or her lawyering activities or punished him or her for those activities states a 1983 claim under the First Amendment. The character of the legal problem to which the activities are directed is irrelevant, as is the jailhouse lawyer's motivation unless such motivation interferes with legitimate penological concerns, such as fee charging.[1]

1. Fee charging alleged here by defendants was not reached as an issue of fact because of the district court's summary dismissal.

Given these principles, Adams and Piccirillo have clearly stated a First Amendment claim about which disputed issues of material fact remain. They claim that they were dismissed from their jobs as law clerks, prohibited from using the Polk law library, forbidden to provide legal assistance to other inmates and transferred to a more punitive institution not for any legitimate penological reason but in retaliation for their activities as jailhouse lawyers. The majority, however, refuses to take a position on the sufficiency of appellants' claim and remands the case so that the district court may make a determination rendered difficult by the majority's narrow treatment of the issue. I agree that this case should be returned to the district court, but would hold that Adams and Piccirillo have stated a first amendment claim and remand for resolution of the factual disputes.

## II. Standing to Raise Other Inmates' Access to Courts Claim

The issue whether Adams and Piccirillo have standing to challenge their transfers on the ground the transfers denied other inmates access to the courts was presented in appellants' complaint and addressed by the district court. However, Adams and Piccirillo failed to request relief consistent with this claim in their complaint and have not so much as mentioned it in subsequent motions. Most significantly, Adams and Piccirillo have not appealed from that part of the district court's order denying their standing to assert the interest of other inmates. The issue is not part of this case and should not have been addressed by the majority. I therefore dissent from the majority's holding that "[i]n a non-class-action context a prisoner has no standing to litigate another prisoner's claim of denial of access to the courts." Maj.Op. at 1080. I write further to express my conviction that the majority's resolution of this issue is contrary to controlling Supreme Court precedent and will, as a practical matter, serve to prevent redress of claims that inmates are denied access to the courts.

Whether or not Adams and Piccirillo have any personal stake in the deprivation suffered by other inmates as a result of their transfer, *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), directs that they be allowed to press the Sixth Amendment rights of other inmates.

In *Johnson v. Avery*, the Supreme Court considered the petition for a writ of habeas corpus of an inmate "writ writer" who had been placed in a maximum security building for violating a prison regulation that proscribed inmate legal assistance. The Supreme Court reversed the decision of the Sixth Circuit denying the petition, not because the inmate had demonstrated that the punishment he suffered violated his own constitutional rights, but because the state had not yet demonstrated that it provided a reasonable alternative to inmate legal assistance to ensure that other inmates had adequate access to the courts. *Id.* at 489–90, 89 S.Ct. at 751. Although the Court's opinion does not discuss the issue of the writ writer's standing to pursue the access to courts claim of other inmates, we may assume the question was considered, for it was raised in the dissenting opinion of Justice White. *Id.* at 501, 89 S.Ct. at 757. Other courts, following *Johnson v. Avery*, have held that a jailhouse lawyer whose services have been prohibited, either by a blanket rule or by an order pertaining only to that inmate, has standing to challenge the prohibition on the ground it deprives other inmates of access to the courts. *See McDonald v. Hall*, 610 F.2d 16, 19 (1st Cir.1979); *Buise v. Hudkins*, 584 F.2d at 227 (7th Cir.1978); *Haymes v. Montanye*, 547 F.2d 188, 191 (2d Cir.1976), *cert. denied*, 431 U.S. 967, 97 S.Ct. 2925, 53 L.Ed.2d 1063 (1977).

Allowing jailhouse lawyers to press the interest of other inmates could have a limited remedial consequence if prison officials demonstrate that the other inmates enjoy constitutionally adequate access to the courts. The writ writer plaintiff then would not be entitled to reinstatement. Even were the writ writer to prevail on the claim, the court would be permitted to order that prison officials provide reasonable

alternatives to the writ writer's assistance if the officials did not wish to reinstate the plaintiff. *Johnson v. Avery*, 393 U.S. at 489–90, 89 S.Ct. at 751.[2]

When the Supreme Court decided *Johnson v. Avery*, it recognized that inmates who are illiterate or poorly educated will effectively be denied access to the courts if they are not allowed to receive assistance from other inmates. The Court realized that the effect of denying third party standing to the jailhouse lawyer would be to eliminate the right of access to the courts of those inmates who, because they are not capable of representing themselves, are most vulnerable to restriction of access. It is therefore especially important that the jailhouse lawyer be accorded standing to litigate on behalf of other inmates, as well as the broadest personal protection consistent with the demands of prison administration. When prison officials retaliate for providing legal assistance by restricting the jailhouse lawyer's activities, relief should be available.

Were this issue squarely before us, I would hold that a jailhouse lawyer who claims to have suffered retaliation for his or her activities may challenge the retaliation on the ground it denies other inmates access to the courts.[3] As the issue is not before us, I dissent from the majority's decision to address it.[4]

**2.** I express no opinion as to whether *Johnson v. Avery* creates in the writ writer a personal right, grounded in the Sixth Amendment, to act as such. *See Navarette v. Enomoto*, 536 F.2d 277 (9th Cir.1976), *rev'd on other grounds sub nom. Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Vaughn v. Trotter*, 516 F.Supp. 886, 893 (M.D.Tenn.1980).

**3.** I express no opinion as to whether any inmate should be allowed to assert the claim that other inmates are being denied access to the courts, regardless of the plaintiff-inmate's relationship to the injury.

**4.** Adams and Piccirillo also raised the claim that their own access to the courts was denied when they were forbidden to use the Polk law library. This claim was also waived when not presented on appeal and the majority properly remains silent on the issue.