NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0901n.06
Filed: November 16, 2005

No. 05-5012

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MARK DIAMOND, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF KENTUCKY |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

**Before: GILMAN and COOK, Circuit Judges; and CARR, District Judge.**[*]

**RONALD LEE GILMAN, CIRCUIT JUDGE.** Mark Diamond appeals the denial of his application for disability insurance benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act (Act). Diamond was 31 years old and a former fast-food restaurant cook when he was diagnosed with a variety of heart ailments in 1999. Until that time, Diamond had been a heavy smoker and drank multiple cans of beer per day. After an administrative law judge (ALJ) denied his application and the Appeals Council concurred, Diamond appealed to the district court, which granted summary judgment in favor of the Commissioner of Social Security (Commissioner). For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

---

[*]The Honorable James G. Carr, Chief United States District Judge for the Northern District of Ohio, sitting by designation.

## A.    Medical and psychological history

Diamond's medical and psychological history is spread over 700 pages of the Administrative

Record in this case.  The following is a summary of the most relevant points.

On July 28, 1999, Diamond was treated for right-side abdominal pain at the King's

Daughters Medical Center in Ashland, Kentucky.  Diamond was later admitted for a cardiac

catheterization procedure in early August of that year after complaining of fatigue and edema in his

legs.  He was diagnosed with alcoholic cardiomyopathy and related heart ailments, as well as

potential liver problems.  Diamond told the doctors who treated him that he smoked 1½ packs of

cigarettes and drank between 8 and 12 cans of beer per day.  Tests revealed that Diamond's "ejection

fraction"—a number used to measure the functioning of the blood-pumping left ventricle—was

25%.  A normal ejection fraction is greater than 55%, and an ejection fraction of below 30%, when

accompanied by other symptoms, qualifies as a presumptive disability under the Act.  *See* 20 C.F.R.

Pt. 404, Subpt. P, App. 1, § 4.02B (2005).  After the initial tests, Dr. Rhonda Ross, the physician

who initially treated Diamond, declared him to be "disabled" and ordered him to refrain from

smoking and from consuming alcohol.

Diamond's physical condition began to improve within weeks after the initial tests.  By

August 30, 1999, he reported feeling very well and told the hospital staff that he did not tire easily

and was walking a mile each day.  His cardiologist, Dr. Richard Paulus, opined in a November 15,

1999 letter that Diamond was "doing substantially better."  Although subsequent tests revealed that

Diamond's ejection fraction had declined to as low as 15%, that measurement improved to 33% in

March of 2000, 52% by August of 2001, and remained in the 45 to 50% range in December of 2001.

Dr. Paulus noted Diamond's overall improvement throughout this period, emphasizing his increased energy, the absence of shortness of breath and chest pains, and Diamond's acknowledgment that he was "doing very well and [was] walking his dog, etc." Nevertheless, when Dr. Paulus was asked by Diamond's attorney in March of 2001 whether Diamond's condition met or equaled any impairment that qualified as a listed disability, Dr. Paulus wrote in, "yes, [c]ardiomyopathy."

Despite the steady improvement in his physical condition, Diamond began to suffer from depression and anxiety related to the early onset of congestive heart failure. His doctors initially responded by teaching him relaxation techniques and encouraging him to "reframe his life" to cope with the diagnosis. Dr. Ross eventually prescribed medication for his depression and to help him quit smoking, but Diamond admitted that he took the medication for only a short time. A psychological evaluation conducted in June of 2001 confirmed that Diamond was suffering from depression, anxiety, and dependent traits, and further noted that he was recovering from alcohol dependency. Outpatient therapy was the recommended course of treatment, and no psychoactive medication was prescribed.

In March of 2002, Dr. William Lynne, a certified psychologist, examined Diamond. Dr. Lynne reviewed Diamond's academic performance and his scores on an IQ test. Diamond was diagnosed with borderline intellectual functioning (BIF), which placed him just above the category of mental retardation. Despite the BIF and Diamond's occasional placement in special education courses during high school, Dr. Lynne found only "mild-moderate" limitations on Diamond's ability to concentrate and pay attention. Dr. Lynne described Diamond as "cognitively capable [of]

understanding simple instructions and work routines." Diamond's mental condition, Dr. Lynne concluded, would moderately limit his ability to adapt and to deal with stressful situations.

Two other doctors evaluated Diamond's overall physical condition in 2002. First, in March of that year, Dr. Mark Carter conducted a consultative examination, after which he opined that Diamond would be "significantly restricted from strenuous activity." He placed restrictions on the temperature and humidity to which Diamond should be subjected in the workplace. Dr. Carter conceded, however, that he had not reviewed Diamond's medical records. In August of 2002, Dr. Cindy Pinson, one of Diamond's treating physicians, completed a form titled "Medical Assessment of Ability to Do Work-Related Activities." Dr. Pinson concluded that Diamond could stand and walk for no more than three hours of an eight-hour day, but that he faced no such limitation on his ability to work while seated. She also found that Diamond was able to lift weights of five or ten pounds "frequently," and that he would require environmental limitations similar to those recommended previously by Dr. Carter.

## B.    Administrative proceedings

Diamond applied for DIB and SSI in August of 1999. His claims were denied at the lower administrative levels. Represented by counsel, Diamond then requested a hearing. An ALJ conducted the hearing in June of 2001, taking testimony from Diamond, Dr. Robert Marshall, and Casey Vass, a vocational expert (VE). Dr. Marshall, a medical expert retained by the government, testified that he could not agree with Dr. Paulus's apparent conclusion that Diamond's heart condition met or equaled the criteria set out in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.02. Relying on Dr. Paulus's office notes and Diamond's medical records, Dr. Marshall explained that the low

ejection fraction that Diamond initially demonstrated was not by itself sufficient to meet the applicable listings. Instead, "there have to be associated symptoms, such as shortness of breath at rest, a positive stress test, [or] persistent congestive heart failure." Because Dr. Paulus's office notes did not indicate any of the additional symptoms associated with a low ejection fraction, Dr. Marshall concluded that Diamond's cardiomyopathy did not meet or equal any of the listed impairments. Dr. Marshall did acknowledge, however, that Diamond's ability to work would be significantly restricted by his physical and mental conditions.

In June of 2001, the ALJ denied Diamond's application for DIB, but did not rule on his SSI application. Diamond filed a second application for DIB and SSI one month later. Meanwhile, the Appeals Council vacated the ALJ's initial decision denying benefits, consolidated Diamond's two applications, and remanded the case to a different ALJ. The second ALJ conducted a new hearing in August of 2002. Diamond and a different VE, Leah Salyers, both testified at the hearing, during which the ALJ asked Salyers, in the form of a hypothetical, whether there were any jobs in the national or regional economy available to someone with Diamond's limitations. The ALJ described the relevant characteristics as (1) a residual functional capacity (RFC) to perform sedentary work; (2) environmental restrictions; and (3) limitations on Diamond's ability to perform certain physical tasks, to understand and carry out detailed instructions, and to adapt to changes in the workplace. Salyers identified at least three positions that met the ALJ's criteria—production inspector, surveillance system monitor, and production grader, sorter, or selector—and provided estimates of how many such positions would be available at the regional and national levels. At the same time,

Salyers acknowledged that no positions would be available if Diamond's own account of his condition was accepted as accurate.

The ALJ evaluated Diamond's claim in accordance with the five-step analysis mandated by federal regulations. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). At step one, the ALJ found that Diamond had not engaged in "substantial gainful activity" since the onset of his heart disease. For the second and third steps, the ALJ adopted the factual findings of the previous ALJ, concluding that Diamond suffered from severe heart disease, but that his condition did not meet or equal a listed impairment for the required 12-month period. The ALJ then performed the mandatory RFC calculation and found that Diamond was capable of performing sedentary work under specific environmental restrictions, and that Diamond had the ability to understand and carry out simple instructions and tolerate workplace changes and a low-stress atmosphere. Applying these findings to the information provided by the VE, the ALJ concluded that Diamond could not perform his past jobs, but could work as a production inspector, a surveillance system monitor, or a production grader, sorter, or selector. Because Diamond was deemed able to engage in a substantial gainful activity, he was found not to be disabled.

## C.    District court proceedings

After the Appeals Council rejected Diamond's appeal and adopted the decision of the ALJ as the Commissioner's final decision, Diamond sought judicial review pursuant to 42 U.S.C. § 405(g). The district court struggled to "decipher" the grounds for Diamond's appeal, finally construing his submission as a challenge to the ALJ's alleged failure to consider the findings of Dr.

Lynne when posing the hypothetical to VE Salyers. Rejecting Diamond's contention, the court found that the ALJ had considered Dr. Lynne's report and had included the report's "findings of mild to moderate limitations in mental functioning" in the ALJ's hypothetical question to VE Salyers. The district court then granted summary judgment in favor of the Commissioner. This timely appeal followed.

## II. ANALYSIS

### A.      Standard of review

We will uphold the Commissioner's decision if it is supported by substantial evidence and if the Commissioner applied the correct legal criteria. *See* 42 U.S.C. § 405(g); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (reviewing the Commissioner's decision "to determin[e] whether the findings of fact . . . are supported by substantial evidence and . . . whether the [Commissioner] employed the proper legal criteria in reaching her conclusion"). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Heston*, 245 F.3d at 534 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). When reviewing the Commissioner's decision, the court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387; *see also Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) (noting that the court should defer to the agency's decision if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

### B.      Diamond has waived most of his challenges to the ALJ's decision

The Commissioner first contends that we should not consider challenges to the ALJ's decision that Diamond did not present to the district court. *See Barner v. Pilkington N. Am.*, 399 F.3d 745, 749 (6th Cir. 2005) (reciting the "well-settled" rule that "this court will not consider an error or issue which could have been raised below but was not") (citation omitted). This court has repeatedly applied this waiver rule in the Social Security context. *See, e.g.*, *Hall v. Comm'r of Soc. Sec.*, No. 04-5572, 2005 WL 2139890, at \*4 (6th Cir. Sept. 2, 2005) (unpublished) (refusing to consider an allegation that the ALJ's decision was not supported by substantial evidence where the claimant failed to make that challenge before the district court); *Young v. Sec. of Health & Human Servs.*, 925 F.2d 146, 149 (6th Cir. 1990) (refusing to evaluate the challenge of a claimant who attributed her allegedly disabling back pain to a cause different from the one that she had argued to the district court).

Diamond's summary judgment motion before the district court, though principally a series of unexplained citations to the administrative record, appeared to challenge the substance of the hypothetical that the ALJ posed to the VE. Specifically, Diamond alleged that the ALJ failed to incorporate into his hypothetical the assessment by Dr. Lynne of Diamond's mental capacity. On appeal, however, Diamond opens his brief by asking this court to consider a series of arguments that he made when requesting review by the Appeals Council, arguments that reach well beyond the scope of the single issue decided by the district court. Even if we were to apply the most "liberal construction" to Diamond's inartful submission to the district court, *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990), the summary judgment motion cannot fairly be read as raising the diverse challenges to the ALJ's decision that Diamond made before the Appeals Council.

*See id.* (emphasizing that this court reviews "the case presented to the district court rather than a better case fashioned after the district court's order") (quoting *Adams v. James*, 784 F.2d 1077, 1080 (11th Cir. 1986)). Because Diamond failed to present to the district court all but one substantive challenge to the ALJ's decision, he has waived those challenges on appeal.

**C.    The ALJ's hypothetical properly incorporated relevant psychological information and the ALJ's own credibility determination**

This leaves us with the one argument that Diamond presented to the district court regarding the hypothetical that the ALJ posed to the VE. Although Diamond's appellate brief does not explicitly dispute the district court's ruling on the propriety of the ALJ's hypothetical, his prior submissions to the Appeals Council appear to challenge the ALJ's overall handling of the mental and psychological information, and we will therefore treat this challenge as properly presented on appeal. Nonetheless, we agree with the district court that the ALJ directly incorporated the information provided by Diamond's physicians and by Dr. Lynne into the hypothetical posed to the VE and later discussed in the ALJ's decision. This information led the ALJ to conclude that Diamond's mental and psychological impairments were "severe," a determination more favorable to Diamond than the one made by the prior ALJ. Even so, the ALJ ultimately concluded that Diamond could engage in gainful activity. This ultimate determination does not imply that the ALJ disregarded the data or testimony concerning Diamond's mental and emotional limitations.

The ALJ also properly incorporated his evaluation of Diamond's credibility into the hypothetical posed to VE Salyers. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (noting that "the ALJ can present a hypothetical to the VE on the basis of his own assessment

if he reasonably deems the claimant's testimony to be inaccurate"). Diamond's credibility was "poor," according to the ALJ, because Diamond had contradicted himself during his testimony—by alleging that he had could barely read, but then admitting that he followed NASCAR and other sports by reading the newspaper—and because his own doctors had refused to accept some of the physical limitations that he claimed to suffer.

These inconsistencies justified the ALJ's reluctance to fully accept Diamond's own account of his condition. *See Heston*, 245 F.3d at 536 (upholding an ALJ's credibility finding that was based on the claimant's ability to perform tasks inconsistent with her alleged medical condition). And because he had reason to doubt Diamond's credibility, the ALJ justifiably concluded at step five that Diamond was capable of engaging in a substantial gainful activity, a conclusion that hinged on whether Diamond's account of his physical and mental limitations was credible. We will not second-guess the ALJ's credibility determination where the record reflects that the decision of the ALJ to reject Diamond's unsubstantiated restrictions is supported by substantial evidence. *See id.*

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.