United States Court of Appeals,

Eleventh Circuit.

No. 96-4577.

Shari L. LYES, Plaintiff-Appellant,

v.

CITY OF RIVIERA BEACH, FLORIDA, Cinthia Becton, Marge Confrey, Bruce Guyton, Bertha Orange, Barbara Rodriguez, Individually and in their official capacities as Members of the Riviera Beach City Council, City of Riviera Beach, Florida, Neil Crilly, individually and in his official capacity as Executive Director of the City of Riviera Beach Community Redevelopment Agency, City of Riviera Beach Community Redevelopment Agency, Defendants-Appellees.

Nov. 5, 1997.

Appeal from the United States District Court for the Southern District of Florida. (No. 95-8285-CIV-KLR), Kenneth L. Ryskamp, Judge.

Before EDMONDSON, Circuit Judge, and KRAVITCH and WOOD[*], Senior Circuit Judges.

KRAVITCH, Senior Circuit Judge:

Shari Lyes contends that the City of Riviera Beach ("the City"), the City of Riviera Beach Community Redevelopment Agency ("the CRA"), and several officials of both entities (collectively, "appellees") discriminated against her because of her gender. Granting summary judgment, the district court held that: (1) it lacked jurisdiction over Lyes's Title VII claim; (2) Lyes had not pleaded a constitutional violation actionable under section 1983; and (3) suits under the civil rights conspiracy statute, 42 U.S.C.A. § 1985(3) (1994), could not be premised upon gender-based discrimination. We reverse and remand.

I.

Florida law permits the governing body of a county or municipality, after appropriate findings of necessity, to create a community redevelopment agency. Fla. Stat. Ann. § 163.356(1) (1997).[1] The governing body and the redevelopment agency are not wholly separate. First, the

[*]Honorable Harlington Wood, Jr., Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

[1]*See id.* § 163.355 (governing body must determine that: (1) slum or blighted areas or areas with shortage of affordable housing exist in jurisdiction; and (2) redevelopment efforts are "necessary in the interest of the public health, safety, morals, or welfare of the residents"); *id.* §

entities share control over redevelopment matters; the redevelopment agency is granted the "powers necessary or convenient to carry out and effectuate the purposes and provisions" of Florida's Community Redevelopment Act, subject to certain enumerated powers of the governing body. *Id.* §§ 163.358, 163.370. Second, the entities share funds. A redevelopment agency receives a fraction of the taxes levied by various governmental entities (including the governing body) within the geographic boundaries of the redevelopment area. *Id.* § 163.387. Third, the entities may share personnel. The redevelopment agency is run either by an appointed board of commissioners or by the governing body itself. *Id.* §§ 163.356(2), 163.357(1)(a). In the latter case, although "[t]he members of the governing body shall be the members of the agency, ... such members constitute the head of a legal entity, separate, distinct, and independent from the governing body of the county or municipality." *Id.* § 163.357(1)(b).

In Riviera Beach, the CRA receives approximately two-thirds of its funds from the City. The City's governing body ("the City Council") also serves as the head of the CRA; each of the five members of the City Council is likewise a member of the CRA Board of Commissioners. Nevertheless, the CRA operates in some ways apart from the City. It maintains its own bank accounts and records. It also has separate staff and offices.

The CRA hired Lyes as a redevelopment planner in July 1989, and she served in that capacity until her termination in December 1993. At the time of Lyes's hire, Don DeLaney was the CRA's Executive Director. DeLaney left in February 1992, whereupon the City Manager, Tony Smith, became the interim Executive Director and drew a separate salary from CRA funds for his service. In July 1993, Lyes learned that Neil Crilly, a planner for the City, was being considered as the permanent Executive Director of the CRA. Lyes made inquiries as to why she was not offered the job. She claims that she was told by Smith and one of the CRA Commissioners that she was unqualified because of her sex. These people allegedly told her that discrimination is "the way of

---

163.356(1) (governing body must also find that there is a specific need for a redevelopment agency).

2

the world," that she would have to "get used to it," and that gender was a factor because the Executive Director would need to deal frequently with male developers. Lyes protested her treatment in writing to the CRA Board.

The CRA Board named Crilly as Executive Director in August 1993, making him Lyes's direct supervisor. The day after Crilly was hired, Lyes filed an EEOC complaint against the CRA, alleging discrimination in hiring. Notice of the complaint was sent to Smith and was forwarded to the CRA on August 25. The next day, Crilly suspended Lyes for refusing to attend a meeting. Crilly claims that he had no knowledge of the EEOC complaint when he suspended Lyes. Lyes filed a second EEOC charge, this time against the City, alleging retaliation. Upon returning from suspension, Lyes received a written reprimand from Crilly.

Lyes filed internal grievances with respect to her suspension and reprimand. Consequently, Crilly requested that James Waldron, Director of Personnel for the City, conduct a review of his discipline towards Lyes. Waldron made a written report approving Crilly's conduct. Within two months, Crilly gave Lyes a negative performance review, a week after which he fired her. Lyes filed a third charge with the EEOC, naming the City and alleging retaliation for the second complaint. She also requested an appeal hearing in connection with her firing. The CRA Board held a hearing at which Lyes and the CRA were represented by counsel and presented evidence. The CRA Board unanimously upheld Lyes's termination.

II.

Lyes's complaint alleged that the foregoing facts constituted gender discrimination actionable under Title VII, 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and Florida law. Appellees responded to the complaint with various motions to dismiss. After converting these motions into motions for summary judgment and allowing the parties to present evidence beyond the initial pleadings, the district court granted summary judgment. Specifically, it held that: (1) it lacked jurisdiction over Lyes's Title VII complaint because the CRA was not an "employer" within the meaning of the statute; (2) appellees were entitled to summary judgment on Lyes's section 1983 claim, in light of

3

this court's opinion in *McKinney v. Pate,* 20 F.3d 1550 (11th Cir.1994), *cert. denied,* 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995); and (3) section 1985(3) does not encompass conspiracies founded on non-racial animus. The district court also dismissed the pendent state law claims without prejudice.

A.

Title VII makes it illegal for an "employer" to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e-2(a)(1). The statute defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person...." *Id.* § 2000e(b). The existence of a Title VII "employer" is a jurisdictional prerequisite to suit under the statute. *Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350, 1359 (11th Cir.1994). The district court concluded that Lyes, an employee of the CRA, did not work for an "employer" because the CRA never has had fifteen or more employees.[2] Consequently, the court dismissed Lyes's Title VII claim for lack of jurisdiction.[3]

We review the district court's jurisdictional dismissal under summary judgment standards. In *Garcia v. Copenhaver, Bell & Assocs.,* 104 F.3d 1256, 1261 (11th Cir.1997), we held that where a factual attack on subject matter jurisdiction implicates an element of the plaintiff's cause of action,

---

[2]We note that the Supreme Court recently decided that an entity's "employer" status should be determined by counting employees under the so-called "payroll method," *see Walters v. Metropolitan Educ. Enters., Inc.,* --- U.S. ----, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997), but this opinion does not affect the instant case. The parties agree that the CRA has had, under any method of counting, no more than five staffpeople at any one time.

[3]The City argues that the district court could have dismissed the City from the suit because Lyes named only the CRA in her initial EEOC charge. Accordingly, the City asks us to affirm on that alternative ground. Although it is true that, "as a general rule, the failure to name a party in the EEOC complaint precludes a future civil action against that party," the requirement is construed liberally, and "[w]here the purposes of the Act are fulfilled, a party unnamed in the EEOC charge may be subjected to the jurisdiction of the federal courts." *Virgo,* 30 F.3d at 1358-59. Here, in view of the shared interests of the City and the CRA detailed in the text, we conclude that notice to the CRA (especially because it was sent to Smith in his dual capacity as Executive Director and City Manager) fulfilled Title VII's purposes.

4

the district court should treat the attack as one on the merits of the plaintiff's claim. The court then should analyze the challenge under Fed.R.Civ.P. 12(b)(6) (if it considers the complaint alone) or Rule 56 (if evidence beyond the complaint is presented). *Id.* We further held that whether a defendant was an "employer" under the Age Discrimination in Employment Act was an element of the plaintiff's cause of action. *Id.* at 1262-65. *Garcia* dictates the appropriate standard in the present case; appellees claimed that, as a factual matter, the district court lacked jurisdiction because Lyes could not prove an element of her claim—that she worked for a Title VII "employer."[4] Because this is so and because the district court considered evidence beyond the allegations of the complaint, it could not dismiss Lyes's Title VII claim unless there was no genuine issue of material fact about whether Lyes worked for a Title VII "employer." On appeal, our review of the district court's decision is plenary, and we apply the same standards as the district court. *Gordan v. Cochran,* 116 F.3d 1438, 1439 (11th Cir.1997).

Lyes claims that the district court erred in concluding that she did not work for an "employer" within the meaning of Title VII because the CRA and the City together have more than fifteen employees and because the entities should be aggregated for counting purposes. Courts have held that aggregation is proper in three circumstances: when the plaintiff "show[s] that the respondent and the actual employer are so integrated in their operations as to be a "single' employer; show[s] that the respondent exercises such control over employment conditions as to be a "joint' employer; or show[s] that the putative employer was an "agent' of the respondent, who is the true employer." 2 BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 1309 (Paul W. Cane, et al., eds., 3d ed.1996). This circuit recognizes Title VII liability under all

---

[4]It is clear that the "employer" issue is part of a Title VII plaintiff's claim. *See Garcia,* 104 F.3d at 1264 ("The only notable difference between [Title VII's and ADEA's] definitions of "employer' is the number of "employees' each statute requires.").

three theories,[5] but Lyes's primary theory, and the one we find dispositive for this appeal, was that the CRA and the City function as a single employer.[6]

We have held that the factors to consider in determining whether private entities operate as a single employer are those administratively promulgated for cases under the National Labor Relations Act ("NLRA"). The "NLRB factors" include: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *McKenzie v. Davenport-Harris Funeral Home,* 834 F.2d 930, 933 (11th Cir.1987). Although the NLRA does not apply to public employers, 29 U.S.C.A. § 152(2) (Supp.1997), Lyes suggests that the same test controls when the plaintiff alleges that two government entities act as a single enterprise. She notes that Title VII's standard for liability does not change depending on whether the plaintiff sues a public or a private entity. *Dothard v. Rawlinson,* 433 U.S. 321, 331 n. 14, 97 S.Ct. 2720, 2728 n. 14, 53 L.Ed.2d 786 (1977) ("Congress expressly indicated the intent that the same Title VII principles be applied to governmental and private employers alike."). We agree with Lyes that there is no principled reason why jurisdictional questions should be resolved any differently in this context, especially in view of the fact that Title VII includes, as "persons" capable of being "employers," both private and many public entities, 42 U.S.C. § 2000e(a) & (b), and our liberal interpretation of the term "employer" in Title VII, *Virgo,* 30 F.3d at 1359. At least two courts have applied the NLRB factors to public employment cases.

---

[5]*See Virgo,* 30 F.3d at 1359-61 (applying joint employer theory); *McKenzie v. Davenport-Harris Funeral Home,* 834 F.2d 930, 933-34 (11th Cir.1987) (applying single employer theory); *Williams v. City of Montgomery,* 742 F.2d 586, 588-89 (11th Cir.1984), *cert. denied,* 471 U.S. 1005, 105 S.Ct. 1868, 85 L.Ed.2d 161 (1985) (applying agency theory).

[6]Lyes referred to the "agency" approach in her pleadings in the district court and before this court. Specifically, she cited *Owens v. Rush,* 636 F.2d 283 (10th Cir.1980), in which the Tenth Circuit held that a Title VII plaintiff who worked for a sheriff's department with fewer than fifteen employees nevertheless worked for an "employer" because the sheriff was an agent of the county (which had well over fifteen employees) for law enforcement purposes. *Id.* at 286. By analogy, it seems proper to consider the CRA an agent of the City for redevelopment purposes and to hold that the City was Lyes's "employer" in Title VII parlance. We need not reach this issue, however, so we decline to say definitively whether agency liability would obtain in similar circumstances.

*See Rivera v. Puerto Rican Home Attendants Servs., Inc.,* 922 F.Supp. 943, 949 (S.D.N.Y.1996); *Riley v. County of Pike,* 761 F.Supp. 74, 76 (C.D.Ill.1991).

Appellees argue, however, that binding circuit precedent precludes use of the NLRB factors in government employment cases. In *Dumas v. Town of Mt. Vernon, Ala.,* 612 F.2d 974 (5th Cir.1980),[7] the district court dismissed a suit against a town for lack of jurisdiction because the town lacked the requisite number of employees. The appellant claimed that, under the NLRB test, the town should have been considered a single employer with the county and the state. Our predecessor circuit, however, "decline[d] to apply this theory to hold that the Town and the state or county, or all three, are a "single employer,' " *id.* at 980 n. 9, without explaining why. The Fifth Circuit since has stated that the *Dumas* court's cryptic statement meant that it considered the NLRB factors inapplicable to government entities because the NLRA exempts public employers. *Trevino v. Celanese Corp.,* 701 F.2d 397, 404 n. 10 (5th Cir.1983).

Although the new Fifth Circuit's interpretation of our shared precedent is instructive, it does not bind us, *United States v. Thomas,* 916 F.2d 647, 651 n. 4 (11th Cir.1990), and we respectfully part company with the *Trevino* court. Instead, we think that the *Dumas* panel's reluctance to consider the single employer theory is better explained in light of our subsequent decision in *Rogero v. Noone,* 704 F.2d 518 (11th Cir.1983). In that case, we held that a Title VII plaintiff could not aggregate the employees of a county tax collector with those of the county for jurisdictional purposes because she had not named the county in the complaint. *Id.* at 521. Similarly, in *Dumas,* the county and the state (with the exception of the county personnel board) had not been made defendants in the plaintiff's suit against the town. 612 F.2d at 976. Looking at *Dumas* through *Rogero* 's lens, we conclude that the *Dumas* court most likely declined to aggregate employees because the plaintiff had failed to name the proper defendants. Accordingly, because treating public and private employers alike comports with Title VII and because *Dumas* is not to the contrary, we

_____

[7]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

7

hold that the NLRB factors must inform a court's inquiry when a plaintiff alleges that multiple governmental entities acted as a single employer and in a discriminatory fashion.

Applying the NLRB factors to the present case, we conclude that Lyes presented sufficient evidence to create a genuine issue of fact that the City and the CRA are a single Title VII "employer"; thus, the district court's jurisdictional dismissal was in error. First, Lyes presented significant evidence that the CRA and the City have interrelated operations. Specifically, the record contains: (1) minutes of the CRA Board meeting considering Crilly's appointment as Executive Director, at which one Commissioner describes the hire as "essentially a "promotion from within' "; (2) CRA bylaws stating that the CRA "Executive Director shall report to the City Manager" and "prepare Agency agendas with coordination of [the] City Manager";[8] (3) an advertisement for the City Manager's job, seeking an applicant with "experience in directing departments of a full service municipality and Community Redevelopment Agency"; and (4) a performance review of Lyes by Smith on a City form, listing the CRA as a department of the City. Further, Lyes directs us to the Florida statutes that divide redevelopment responsibilities between municipal governments and redevelopment authorities. *See* Fla. Stat. Ann. §§ 163.358, 163.370. Appellees argue, consistent with the district court's order, that the operations of the CRA and the City are not interrelated because the entities have separate bank accounts, offices, and records, and because Florida law describes a redevelopment authority as "a legal entity, separate, distinct, and independent from the governing body of the county or municipality." *Id.* § 163.357(1)(b). We agree that these facts are relevant, but they do not erase the fact question created by Lyes's evidence of interrelation.

---

[8]The parties introduced different versions of the CRA bylaws. In appellees' submission—which bears the notation "Revised 11/17/93"—neither of the references to the City Manager's role vis-a-vis the Executive Director appears. Because these amendments seem to have been adopted after Lyes had filed her second EEOC charge and only a month before her termination, we consider the former bylaws as probative evidence of the workings of the entity which discharged Lyes. We also note that the timing is somewhat suspicious; the change occurred within three months of the City's first notice that it was a potential defendant.

8

Second, and most importantly,[9] Lyes has introduced evidence of centralized control of labor relations sufficient to survive summary judgment. Citing the CRA's bylaws, the district court concluded, and appellees argue here, that the CRA Executive Director is solely responsible for hiring and supervising agency staff.[10] Lyes introduced evidence contrary to appellees' contention. For one, the CRA's bylaws only recently gave the Executive Director sole responsibility for hiring and firing; it appears that the Executive Director reported to the City Manager until one month prior to Lyes's dismissal. *See* note 8, *supra.* In addition, the fact that Crilly requested the City's personnel director to review his discipline towards Lyes[11] and the fact that the City attorney acted as a hearing officer when the CRA Board considered Lyes's request for reinstatement both point to City control of labor relations.

Third, it cannot be doubted that the CRA and the City share common management. The same five people serve on the City Council and the CRA Board, the policy-making bodies of both entities. Moreover, for a year and a half, Tony Smith served as both City Manager and CRA Executive Director. The district court, however, concluded that it was unclear that the City and the CRA are commonly managed, again citing the statutory provision that declares redevelopment agencies to be separate and independent. But legislative declarations do not change the facts; these entities are managed commonly.[12]

---

[9]Courts often have noted that this factor should be weighed more heavily than others. *See* LINDEMANN & GROSSMAN, *supra,* at 1310 (collecting cases).

[10]Appellees also rely on Crilly's employment contract, which provides that he serves at the pleasure of the CRA Board. This proof is only marginally helpful; it says simply that Crilly's employment conditions are controlled by the CRA, but says nothing about the CRA staff in general or Lyes in particular.

[11]The district court's disposal of this evidence was inappropriate on summary judgment. It stated, "[t]hat a City employee approved a CRA disciplinary action ... is not *convincing evidence* that the City has substantial control over CRA employees." *Lyes v. City of Riviera Beach,* No. 95-8285-CIV-RYSKAMP, slip op. at 18 (S.D.Fla.1996) (emphasis added). The court erred in weighing the evidence beyond what was necessary—determining whether a fact question existed.

[12]Indeed, the Florida Attorney General has recognized that this statute is not talismanic; in an unrelated context, he acknowledged the statute but opined: "the Miami Beach Redevelopment

Finally, Lyes has introduced ample evidence that the CRA is fiscally dependent on the City. The CRA lacks independent revenue-raising power; instead, the relevant taxing authorities (both city and county) pay a portion of their revenues to the CRA. Accordingly, the CRA receives two-thirds of its budget from City taxes. Lyes also points out that the City made an interest-free loan to the CRA, and we take notice of the Florida statutes permitting the City to provide further funds to the CRA. *See* Fla. Stat. Ann. § 163.358(3) (governing body may authorize issuance of revenue bonds for redevelopment activities); *id.* § 163.356(3)(d) (governing body may appropriate to redevelopment agency sufficient funds for operating expenses).

The totality of the circumstances thus indicates that genuine questions of fact remain as to whether or not the CRA and the City have sufficiently overlapping operations so as to be considered a single employer. Consequently, we must reverse the district court's summary judgment to the contrary.

### B.

In the district court, Lyes sought relief under 42 U.S.C. § 1983, alleging unconstitutional gender discrimination in public employment. Although she invoked the Fourteenth Amendment, Lyes did not specifically style this claim as one to vindicate her rights under the Equal Protection Clause. This pleading oversight led the district court to analyze her constitutional argument in light of our due process precedent alone. In her appellate brief, however, Lyes labels her claim appropriately.[13] We must decide whether Lyes's pleadings were sufficient to give appellees and the court notice of an equal protection claim, thus necessitating remand. We conclude that they were.

Lyes's complaint contains numerous allegations consistent with an equal protection cause of action. Most strikingly, Lyes claims that she was told outright that she was not promoted because of her gender. Moreover, Count III of the complaint alleged: (1) "It has been the policy and custom

---

Agency is an agency of the City of Miami Beach and not a juristic entity which is legally separate and distinct from the city...." Op. Fla. Atty. Gen. 82-5 (Feb. 4, 1982) (internal quotations omitted).

[13]Appellant's Br. at 46.

of Defendants ... acting individually and in their official capacities, to discriminate against female employees"; (2) "Defendants ... have implemented this policy and custom of keeping females out of management positions by not selecting Plaintiff for the position of Executive Director"; (3) "Defendants' action constituted sexual discrimination of Plaintiff, violation of her Civil Rights, her due process of law, and constituted a deprivation of her rights, privileges and immunities"; (4) "The sexually discriminatory acts of Defendants and their refusal to follow departmental standards and procedures for hiring ... were actions under the color, regulations, customs, and usages of the State of Florida"; (5) "The actions subjected Plaintiff ... to the deprivation of rights ..., to wit: Plaintiff's right under § 1983 ... to be free from discrimination in employment and to be protected by due process of law."[14] The portion of Lyes's complaint devoted to 42 U.S.C. § 1985(3) also charged the same defendants with conspiring to discriminate against her in violation of the Equal Protection Clause. In view of these allegations, we conclude that the complaint was factually detailed enough to give appellees a strong indication that equal protection was at issue, even if the legal theory was inarticulately expressed. *See Luckett v. Rent-A-Center, Inc.,* 53 F.3d 871, 873 (7th Cir.), *cert. denied,* --- U.S. ----, 116 S.Ct. 420, 133 L.Ed.2d 337 (1995) ("Complaints need not plead legal theories."); *Bramlet v. Wilson,* 495 F.2d 714, 716 (8th Cir.1974) ("[A] complaint should not be dismissed merely because a plaintiff's allegations do not support the particular legal theory he advances, for the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory.").

Our inquiry does not end, however, with a determination that the complaint provided adequate notice to the appellees of an equal protection claim. Because the district court granted summary judgment after allowing the parties further to refine their arguments, as opposed to dismissing Lyes's complaint, we must ask, in light of the pleadings before the district court on summary judgment, whether Lyes sufficiently expressed her equal protection theory *to the court. See Adams v. James,* 784 F.2d 1077, 1081 (11th Cir.1986) (remanding after summary judgment

[14]Plaintiff's Amended Verified Complaint at 15-17.

where appellants identified actionable theory on appeal and the "pleadings [were] broad enough to encompass such a theory"). Indeed, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir.) (citation omitted), *cert. denied,* --- U.S. ----, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995); *see also Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir.), *cert. denied,* 513 U.S. 868, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994) (holding that district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment"). Nevertheless, the pleadings before the court on summary judgment, like all pleadings, "shall be so construed as to do substantial justice." Fed.R.Civ.P. 8(f).

Appellees, ignoring the equal protection implications of Lyes's complaint, moved for summary judgment on the ground that Lyes did not state an actionable due process claim in light of *McKinney v. Pate,* 20 F.3d 1550 (11th Cir.1994), *cert. denied,* 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995). Specifically, they argued that Lyes's job was, at best, a state-created property right, and that, after *McKinney,* deprivations of state-created rights do not offend the substantive component of due process.[15] Lyes responded by distinguishing *McKinney* as involving only a state law claim; she claimed that, unlike herself, the plaintiff in *McKinney* "was not suing for a violation of any civil rights," that is, "fundamental rights which are created only by the constitution." Plaintiff's Response to Defendant's Motion to Dismiss at 10 (emphasis omitted). Although Lyes and

---

[15]Appellees further argued—and the district court agreed—that any procedural due process claim was meritless for two reasons: first, that Lyes did not have a protected property right in her job, as she was an at-will employee; and second, that appellees gave Lyes all the process she was due by providing her a hearing in which she could present her case. Lyes does not appeal the district court's ruling on this issue and we therefore deem it abandoned. *See Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1573 n. 6 (1989). To the extent that Lyes continues to maintain on appeal that appellees violated the Due Process Clause by making a false and stigmatizing statement in the process of discharging her, we affirm the district court. *See* 11th Cir. R. 36-1.

12

her counsel would have been well-served to have identified her federal civil rights claim as an equal protection claim at this juncture, we conclude that the above-quoted statements should have alerted the district court to her continued reliance upon an equal protection theory. Indeed, the district court realized that Lyes opposed summary judgment because of an asserted constitutional right against gender discrimination:

> It appears that Lyes is arguing that she has a fundamental right not to be discriminated against on the basis of her gender, and that this right rose to the level of a property interest when she was terminated for discriminatory reasons. Lyes, however, fails in her attempt to avoid the consequences of *McKinney.* The Court is not persuaded by Lyes['s] argument that she has a recognized fundamental right not to be terminated based on her gender. Lyes cannot take a gender based Title VII claim and transform it into a Constitutional claim by alleging discrimination. Applying Lyes'[s] reasoning to its logical conclusion would provide every discrimination plaintiff with an additional substantive due process claim.

*Lyes v. City of Riviera Beach,* No. 95-8285-CIV-RYSKAMP, slip op. at 24-25 (S.D.Fla.1996).[16] The district court's rejection on summary judgment of Lyes's claim under a due process rubric was overly formalistic. Not only did the factual allegations of Lyes's complaint invoke equal protection, but her continued reference to due process should not have been viewed as fatal to an equal protection claim, as "the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive." *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). Consequently, the district court, understanding that Lyes alleged a constitutional right to be free from gender discrimination, should have considered whether Lyes stated an equal protection claim.

We therefore conclude that Lyes's complaint and responsive pleadings, although far from a model of clarity, sufficiently notified appellees and the district court that she was challenging her termination on an equal protection theory. Accordingly, the district court on remand should analyze Lyes's equal protection claim to determine if summary judgment is proper.

C.

---

[16]We expressly reject the district court's apparent assumption that Title VII is an exclusive remedy for discrimination by state and municipal employers. We have assumed otherwise in our prior cases. *See Cross v. State of Ala.,* 49 F.3d 1490, 1507 (11th Cir.1995) (allowing parallel section 1983 and Title VII claims in public employment context).

13

Lyes also alleged that appellees conspired to deprive her of her equal protection rights in violation of 42 U.S.C. § 1985(3) by denying her the Executive Director's job and eventually terminating her. The district court denied relief because neither the Supreme Court[17] nor this circuit has ever addressed whether gender-based conspiracies are actionable under 42 U.S.C. § 1985(3) and because it was disinclined to "broaden what is actionable under § 1985(3) to include gender based claims."[18] The district court did not, however, consider whether there was reason to believe that the statute itself encompasses gender discrimination. Because we conclude that the language, history, and judicial interpretations of section 1985(3) all indicate that conspiracies to discriminate based on sex are actionable, we reverse the district court.[19]

We begin with the statute's plain language. Section 1985(3) provides:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and

---

[17]The Supreme Court has reserved the question of section 1985(3)'s application to gender-based conspiracies. *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 269, 113 S.Ct. 753, 759, 122 L.Ed.2d 34 (1993). A number of Justices, however, have had occasion to express their view on the issue. *See id.* at 295, 113 S.Ct. at 772 (Souter, J., concurring in part, dissenting in part) (suggesting that animus requirement of section 1985(3) implicates at least "those constitutional equal protection cases that deal with classifications calling for strict or heightened scrutiny, as when official discriminations employ such characteristics as race, national origin, alienage, gender, or illegitimacy"); *id.* at 319, 113 S.Ct. at 785 (Stevens, J., joined by Blackmun, J., dissenting) (gender-based conspiracies covered under section 1985(3)); *id.* at 349, 113 S.Ct. at 801 (O'Connor, J., dissenting) (same); *Great American Federal Savings and Loan Assn. v. Novotny,* 442 U.S. 366, 389 n. 6, 99 S.Ct. 2345, 2358 n. 6, 60 L.Ed.2d 957 (1979) (White, J., joined by Brennan and Marshall, JJ., dissenting) (same).

[18]*Lyes,* slip op. at 31.

[19]We note that only one element—whether gender-based animus can trigger section 1985(3)'s protection—of Lyes's cause of action is involved in the present appeal. To succeed on remand Lyes must still prove:

> (1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Childree v. UAP/GA CHEM, Inc.,* 92 F.3d 1140, 1146 (11th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 1080, 137 L.Ed.2d 216 (1997).

immunities under the laws ..., the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

The statute on its face does not exclude women from its coverage. Rather, the section's use of the phrase "equal protection of the laws," enacted only three years after the Fourteenth Amendment was ratified with identical language, *see* U.S. CONST. amend. XIV, § 1, suggests that the enacting Congress intended section 1985(3)'s coverage to track Fourteenth Amendment jurisprudence, which now views women as a protected class. *Craig v. Boren,* 429 U.S. 190, 198, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976). As the Second Circuit has noted, "[b]y its very language § 1985(3) is necessarily tied to evolving notions of equality and citizenship." *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1359 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990).

The legislative history of section 1985(3) also does not warrant a restrictive view of the classes protected by the provision. The members of the 42d Congress may not have had the protection of women foremost in their minds when enacting the provision that became section 1985(3), but neither did they endeavor to limit the statute's scope. As Senator Edmunds, the floor manager for the bill remarked, a conspiracy would be actionable if "it should appear that [the] conspiracy was formed against [a] man because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter...." CONG. GLOBE, 42d Cong., 1st Sess. 567 (1871). More to the point, a member of the House observed that the bill was intended for all Americans: "It is not to protect Republicans only in their property, liberties, and lives, but Democrats as well, not the colored only, but the whites also; yes, even women and children...." *Id.* at App. 190 (statement of Rep. Buckley). Thus, although "it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause," *United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 836, 103 S.Ct. 3352, 3360, 77 L.Ed.2d 1049 (1983), the legislative history is

15

consistent with a view of the statute as imposing liability for conspiracies beyond those based on race.

Similarly, the judicial gloss that the statute has acquired since its enactment leads us to conclude that women are a class protected by section 1985(3). The Supreme Court has stated that the provision's "language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971) (emphasis in original). Persons alleging a gender-based conspiracy easily satisfy this condition. It is now beyond cavil that intentional discrimination based on sex, "an immutable characteristic determined solely by the accident of birth," *Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973), is unconstitutionally invidious. *See, e.g., id.* at 686-87, 93 S.Ct. at 1770-71 ("statutory distinctions between the sexes often have the effect of invidiously relegating the entire class of females to inferior legal status without regard to the actual capabilities of its individual members").[20] Accordingly, seven courts

---

[20]An additional burden on section 1985(3) plaintiffs is not present in the instant case. "A § 1985(3) private conspiracy ... requires an intent to deprive persons of a right guaranteed against private impairment." *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 274, 113 S.Ct. 753, 762, 122 L.Ed.2d 34 (1993). That is, where the plaintiff alleges that private persons conspired to deprive him or her of a constitutional right, he or she must also establish that the right in question is one that the individual possesses against the world at large, not simply against the government. *See United Bhd. of Carpenters,* 463 U.S. at 831-33, 103 S.Ct. at 3357-59 (equal protection and free speech rights exist against the government; wholly private conspiracy to deprive persons of such rights not actionable). In this case, however, Lyes alleges that public officials conspired to deprive her of her Fourteenth Amendment rights, so the *Bray* /*Carpenters* limitation does not apply.

16

of appeals[21] have held that section 1985(3) embraces suits premised on gender-based conspiracies. We do likewise.

III.

Accordingly, we REVERSE the order of the district court, save for those issues discussed in note 15, *supra,* which we AFFIRM. This case is REMANDED to the district court for proceedings consistent with this opinion.

EDMONDSON, Circuit Judge, concurring in part and dissenting in part:

I dissent on each issue, except I concur in the result on the section 1983 claim and on the Due Process claim discussed in footnote 15.

---

[21]*See Libertad v. Welch,* 53 F.3d 428, 449 (1st Cir.1995); *National Org. for Women v. Operation Rescue,* 914 F.2d 582, 585 (4th Cir.1990), *rev'd in part, vacated in part on other grounds sub nom., Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993); *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1359 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); *Volk v. Coler,* 845 F.2d 1422, 1434 (7th Cir.1988); *Life Ins. Co. of N. Am. v. Reichardt,* 591 F.2d 499, 505 (9th Cir.1979); *Novotny v. Great Am. Fed. Sav. & Loan Ass'n,* 584 F.2d 1235, 1243-44 (3d Cir.1978), *vacated on other grounds,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); *Conroy v. Conroy,* 575 F.2d 175, 177 (8th Cir.1978). *See also Haverstick Enters., Inc. v. Financial Fed. Credit, Inc.,* 32 F.3d 989, 994 (6th Cir.1994) (dicta) (suggesting gender is covered).

Two Circuits have suggested that section 1985(3) is limited to race-based conspiracies, but did so in cases where a gender-based conspiracy was not at issue. *See Deubert v. Gulf Fed. Sav. Bank,* 820 F.2d 754, 757 (5th Cir.1987) (whistleblowers); *Wilhelm v. Continental Title Co.,* 720 F.2d 1173, 1176 (10th Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1601, 80 L.Ed.2d 131 (1984) (disabled persons). We also have expressed doubt about the breadth of the provision based on the Supreme Court's *Novotny* decision, where the Court held that rights created by Title VII could not form the basis of a section 1985(3) claim, in part because suing under 1985(3) would allow plaintiffs to dodge the procedural requirements in Title VII. *Faucher v. Rodziewicz,* 891 F.2d 864, 871 n. 4 (11th Cir.1990). Because it is now evident, however, that Title VII and the civil rights statutes may provide separate remedies for discrimination in the public sector workplace, *Cross v. State of Ala.,* 49 F.3d 1490, 1507 (11th Cir.1995), our concern in *Faucher* evaporates.

17