Barbara **THORNTON, Sharon Wright, Leroy Jackson and the class they seek to represent, Plaintiffs,**

v.

**MERCANTILE STORES COMPANY, INC., d/b/a Gayfer's/J.B. White and Gayfer's/Mercantile South, Gayfer's Montgomery Fair Co., Defendants.**

Civil Action No. 96–D–1484–N.

United States District Court,
M.D. Alabama,
Northern Division.

July 31, 1998.

Robert F. Childs, Jr., Ann K. Wiggins, Ann C. Robertson, Maury Steven Weiner, Laura M. Hitt, Birmingham, AL, for Plaintiffs.

E. Barry Johnson, Charles A. Stewart, Montgomery, Fern Singer, E. Barry Johnson, Robert M. Lichenstein, Jr., Birmingham, AL, for Defendants.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court are the following motions: (1) Plaintiffs' Motion For Class Certification, filed July 15, 1997; (2) Gayfer's Montgomery Fair Co.'s ("Gayfer's") Motion To Stay Class Certification, filed August 7, 1997; (3) Gayfer's Motion For Summary Judgment, filed August 18, 1997; (4) Mercantile Store Co., Inc.'s ("Mercantile") Motion For Summary Judgment, filed January 20, 1998; (5) Plaintiffs' Motion To Strike Gayfer's February 6, 1998 Submission Of Evidence In Support Of Reply Brief In Support Of Gayfer's Motion For Summary Judgment, filed March 20, 1998; and (6) Gayfer's Motion To Strike Portions Of Plaintiffs' Brief In Support Of Their Motion To Strike As An Invalid Surreply Filed Without Leave Of Court, filed April 9, 1998. Appropriate responsive pleadings have been filed to all of these motions.

After careful consideration of the arguments of counsel, relevant law, and the record as a whole, the court finds that: (1) Plaintiffs' Motion For Class Certification is due to be dismissed without prejudice, however, as explained below, Plaintiffs may renew their motion, if necessary and appropriate; (2) Gayfer's Motion To Stay Class Certification is due to be denied as moot; (3) the court will refrain from ruling on Gayfer's Motion For Summary Judgment; (4) Mercantile's Motion For Summary Judgment is due to be denied; (5) Plaintiffs'

Motion To Strike Gayfer's February 6, 1998 Submission Of Evidence In Support Of Reply Brief In Support Of Gayfer's Motion For Summary Judgment is due to be denied; (6) Gayfer's Motion To Strike Portions Of Plaintiffs' Brief In Support Of Their Motion To Strike As An Invalid Surreply Filed Without Leave Of Court is due to be denied.[1]

Also before the court are the following motions: (1) Mercantile's Motion To Dismiss For Lack Of Personal Jurisdiction, filed July 3, 1997; (2) Plaintiffs' Motion To Amend The Court's Uniform Scheduling Order, filed August 22, 1997; (3) Mercantile's Motion For An Extension Of Time To File Dispositive Motions, filed December 5, 1997; (4) the Parties' Joint Motion To Extend Time To Disclose Expert Witnesses, filed December 17, 1997; (5) Plaintiffs' Motion To Set Time For Response To Mercantile's Motion For Summary Judgment, filed January 26, 1998; and (6) Plaintiffs' Motion To Extend Time To Disclose Expert Witnesses, filed May 22, 1998.

After careful consideration of the arguments of counsel, relevant law, and the record as a whole, the court finds as follows: (1) the court will refrain from ruling on Mercan-

tile's Motion To Dismiss For Lack Of Personal Jurisdiction because Mercantile withdrew its Motion on October 2, 1997. The Clerk of the Court is directed to remove Mercantile's Motion To Dismiss For Lack Of Personal Jurisdiction from the pending motion's docket of this action; (2) Plaintiffs' Motion To Amend The Court's Uniform Scheduling Order is due to be denied as moot; (3) Mercantile's Motion For An Extension Of Time To File Dispositive Motions is due to be denied as moot; (4) the Parties' Joint Motion To Extend Time To Disclose Expert Witnesses is due to be denied as moot; (5) Plaintiffs' Motion To Set Time For Response To Mercantile's Motion For Summary Judgment is due to be denied as moot; and (6) Plaintiffs' May 22, 1998 Motion To Extend Time To Disclose Expert Witnesses is due to be denied as moot.[2]

## JURISDICTION

The court properly exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1343(a) (civil rights); and 28 U.S.C. § 2201 (declaratory judgment). The Parties do not contest personal jurisdiction or venue.

---

1. The principal objections raised in Plaintiffs' Motion To Strike Gayfer's February 6, 1998 Submission Of Evidence In Support Of Reply Brief In Support Of Gayfer's Motion For Summary Judgment are that Gayfer's failed to comply with a scheduling deadline and that "allowing the defendant to submit additional supplementary evidence in support of its motion for summary judgment deprives the plaintiff of her opportunity to rebut the defendants' arguments." (Pls.' Mot. To Strike at 2, ¶5; see also Pls.' Br. In Supp. Of Mot. To Strike at 1,3.)

In their Motion To Strike Portions Of Plaintiffs' Brief In Support Of Their Motion To Strike As An Invalid Surreply Filed Without Leave Of Court, Gayfer's argues that attaching evidence to reply briefs is a routine practice in federal courts, and that the evidence filed proffers no new legal grounds or new evidence. (Gayfer's Resp. To Pls.' Mot. To Strike And Gayfer's Mot. To Strike at 1–2.) Gayfer's also argues that the bulk of Plaintiffs' Motion To Strike contains substantive responses to Gayfer's arguments and is not supportive of their Motion To Strike, and, consequently, should be stricken as an invalid surreply. (Id.)

The court notes that in Plaintiffs' Brief In Support of their Motion To Strike, Plaintiffs' offer rebuttal argument. (Pls.' Br. In Supp. Of Mot.

To Strike at 3–12.) The court also notes that Gayfer's February 6, 1998 submission, was, arguably, filed out-of-time. In the interest of a complete factual and legal record, and instead of striking Plaintiffs' Motion To Strike and allowing Defendants' February 6, 1998 submission (which was, arguably, filed out-of-time) to remain in the evidentiary record, the court will deny both Motions To Strike and allow Gayfer's evidence to remain in the evidentiary record, while at the same time allowing Plaintiffs to offer any additional argument they may wish to submit in response to Gayfer's February 6, 1998 submission.

On July 17, 1998, the court telephoned counsel for both Parties and informed counsel that the court would allow Plaintiffs to file any additional response to Gayfer's February 6, 1998 Submission Of Evidence on or before 3:00 P.M., Wednesday, July 22, 1998. Counsel for Gayfer's indicated that they had no objection. Accordingly, the court finds that both Plaintiffs' Motion To Strike and Gayfer's Motion To Strike are due to be denied.

2. On July 29, 1998, the court granted Plaintiffs' July 27, 1998 Motion To Extend Time for the Parties To Disclose Expert Witnesses.

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once this initial demonstration under Rule 56(c) is made, the burden of production, not

persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *see also* Fed.R.Civ.P. 56(e).

In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

## DISCUSSION

### I. Factual Summary And Procedural History

Plaintiffs Barbara Thornton, Sharon Wright, and Leroy Jackson are current employees of Gayfer's and Mercantile who work at various Gayfer's stores in Montgomery, Alabama. They are all African–American. The Plaintiffs allege that the Defendants have violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), as well was 42 U.S.C. § 1981, which prohibits racial discrimination in the making and enforcement of contracts, *see* 42 U.S.C. § 1981, by discriminating against them, on the basis of race, in the areas of advancement opportunities and pay. In Plaintiffs' Second Amended Complaint, Plaintiff Jackson also alleges racial discrimination in other terms and conditions of employment in violation of § 1981 and Title VII. The Plaintiffs bring their claims on behalf of a class, alleging that the Defendants have engaged in a pattern or practice of discrimination and that certain of their policies have an unjustified disparate impact on African–Americans.

Gayfer's operates two retail stores in Montgomery, Alabama; one at the Montgomery Mall, and one at the Eastdale Mall. Also in Montgomery are a Gayfer's Distribution Center, which stores and ships merchan-

dise to various stores, and a "Group Office," which performs various administrative functions. Gayfer's is a wholly owned subsidiary of Mercantile, which is based in Fairfield, Ohio.

Mercantile subsidiaries are geographically organized into five "operating groups." Gayfer's is in a group with other Mercantile subsidiaries and affiliates called "Gayfer's/J.B. White" or "Mercantile Southeast." Even though Mercantile is the sole shareholder of Gayfer's, Mercantile maintains a separate corporate structure, a separate board of directors and separate bank accounts from Gayfer's. Mercantile contends that although officers in Mercantile subsidiaries, such as Gayfer's, are ultimately responsible to Mercantile officers, "the relationship is one of oversight, not of controlling the details of the work of subsidiary officers and employees." (Mercantile Memorandum Brief In Support Of Its Motion For Summary Judgment ("Mercantile Mem.") at 2.)

Gayfer's Director of Human Resources is Reed Wilbanks, a white male. He has been the Director since March of 1994. The Operations Manager of the Eastdale Mall store is John Myrick, an African–American male. May Ann Hankins is the Human Resource Manager at Gayfer's Distribution Center. Between 1989 and 1994, she was the Human Resource Manager at the Montgomery Mall store. Hankins is a white female.

### A. Plaintiff Barbara Thornton

Barbara Thornton began working for Gayfer's in 1985 as a sales associate at Gayfer's Montgomey Mall store. She left her employment in 1986 when her family moved to South Carolina, but returned to Gayfer's in 1987 as a sales associate. In November of 1987, she injured her knee and sought a transfer to a clerical position. She was first transferred to a clerical position in Item Control, and then to the Accounting Division, where she stayed for approximately one year. She then transferred back to a clerical position in Item Control. During her second stint in Item Control, Thornton improved the department's efficiency.

In 1993, Thornton learned of a newly-created department called the Locator Department. This department was created to locate merchandise in other Gayfer's stores and arrange for it to be shipped to Gayfer's customers. Mary Ann Hankins, the Human Resource Manager at the time, informed Thornton that she was going to be transferred to the Locator Department. Thornton told one of her supervisors, Ed Thornton, that she did not want to be transferred because she had worked hard to improve Item Control, and wanted to stay in that department. Nevertheless, Thornton was transferred to the Locator Department. She was given an increase in pay.

In 1994, the Locator Department was moved from the Montgomery Mall store to the Eastdale Mall store. In early August of 1996, Thornton informed her supervisors that she was interested in obtaining a clerical position in the Group Office. Thornton spoke with Sharon Ruud, an Assistant Human Resources Manager, about the position. After Ruud informed Thornton that there were no clerical positions available, Thornton asked to be considered for the vacant Clerical Supervisor position which had been held by Clyde Mills, a white male, who had been promoted. Because the vacancy in the Clerical Supervisor position was not posted or announced in any way by Gayfer's, Thornton asked Ruud about the qualifications required for the position and the manner in which she should apply. Ruud told Thornton that she had been informed that the vacant Clerical Supervisor position would not be filled, but that Ruud would keep Thornton in mind should the vacancy become available. Two days later, Ruud informed Thornton that Laura Rhodes, a white female, had been promoted to the Clerical Supervisor position.

Thornton's primary complaint appears to be that she was not promoted. (*See* Pls.' Br. In Opp. To Gayfer's Mot. For Summ. J. at 1–9, 21–30.)

### B. Plaintiff Sharon Wright

Sharon Wright was hired by Gayfer's as a temporary seasonal employee in November of 1992. After first working as a "floater," Wright became a sales associate in the Candy Department, where she remained for approximately three years. Her initial duties included baking cookies, waiting on customers, ringing up sales, and putting out candy.

In the summer of 1994, her responsibilities increased due to the departure of several employees. In addition to her other duties, Wright became responsible for ordering cookies from suppliers and preparing the necessary paperwork to order candy for the Department. When Wright received these additional duties, she asked Hankins, the Human Resources Manager at the time, if she could be promoted to the Floor Manager (aka "Floor Supervisor") position in the Candy Department. At the time, Renee Strickland, a white female, was the Floor Manager.

Prior to 1994, the Candy Department was under the supervision of a group buyer; there was no Department Manager. At the time Wright inquired about the Floor Manager position, however, Gayfer's was reorganizing the Department, and a Department Manager was appointed. With the appointment of a Department Manager, there was no longer a need for a Floor Manager, and Renee Strickland's position and responsibilities as Floor Manager were eliminated. Strickland remained with the Candy Department as a sales associate.

In September of 1996, Wright was transferred to the Eastdale Mall store as a sales associate in the Coffee Cart Department. The other full-time sales associate in the Coffee Cart Department was Cratina Connell, a white female. Connell's job responsibilities included opening the register, ringing up customers, selling merchandise, making coffee, grinding coffee, and ordering supplies. Wright performed the same duties, except that she only ordered supplies on the days when Connell was not working. Apparently, coffee was ordered separately from the Department's supplies, and both Connell and Wright ordered coffee. Although it is not clear, Wright was under the assumption that Connell was in charge of the Coffee Cart Department and/or was an acting manager. In February of 1997, Connell was promoted to a Promotions Assistant position in the Group Office. Wright currently performs all of Connell's former duties.

Wright contends that she was paid less than other similarly situated white employees, and that she would have applied for the Promotions Assistant position given to Connell had she known that the position was available.[3] (Pls.' Br. In Opp. To Gayfer's Mot. For Summ. J. at 9–16, 30–34.)

### C. Plaintiff Leroy Jackson

Leroy Jackson began working for Gayfer's in October of 1994 as a stock person in Gayfer's Eastdale Mall Home Store. His starting salary was $4.50 per hour. After three months he was paid $4.70 per hour and between six months and one year after he began working for Gayfer's, he received $6.00 per hour. In 1996, Jackson was transferred from the Home Store to the dock at the Eastdale Mall store. After one year working at the dock, he was transferred to his current position in the stock room at the Eastdale Mall store. He makes $6.30 per hour.

Jackson contends that approximately six months after he began working as a stock person at the Home Store at $4.50 per hour, Gayfer's hired Rodney Danford, a white male to work as a stock person at $5.00 per hour. After three months, while Jackson was only given $4.70 per hour, a raise of 20 cents, Danford was given $6.00 per hour, a raise of one dollar. Jackson was only given $6.00 per hour after approximately six months or one year. John Myrick, Operations Manager of the Eastdale Mall Store testified that he could not explain the difference in pay between Jackson and Danford. (Pls.' Evid., Ex. 15, Myrick Dep. ("Myrick Dep.") at 34.)

Jackson's primary complaint is that he was subjected to discrimination in pay on the basis of his race. (Pls.' Br. In Opp. To Gayfer's Mot. For Summ. J. at 16–17, 34–35.)

Plaintiffs originally filed this action on September 27, 1996. Their Second Amended Complaint was filed on July 28, 1997. Gayfer's filed its Answer on December 2, 1996, and Mercantile filed its Answer on October 2, 1997. The plethora of motions outlined above followed.

3. Plaintiffs contend that Gayfer's does not post any of its vacancies. (Pls.' Br. In Opp. To Gayfer's Mot. For Summ. J. at 14.)

## II. Analysis

As noted, Plaintiffs bring their claims on behalf of a class. Accordingly, the first issue for the court's resolution is whether to first address Plaintiffs' Motion For Class Certification, or whether to address Gayfer's and Mercantile's respective Motions For Summary Judgment. For the reasons set forth below, the court will first address the Defendants' Motions For Summary Judgment.

### A. Plaintiffs' Motion For Class Certification And Gayfer's Motion To Stay Class Certification Pending Resolution Of Gayfer's and Mercantile's Motions For Summary Judgment

Plaintiffs filed their Motion For Class Certification on July 15, 1997. Gayfer's filed their Motion To Stay Class Certification on August 7, 1997. Gayfer's also sought a stay of class discovery—as opposed to discovery related to the named Plaintiffs—pending resolution of the Motions For Summary Judgment. The scope of discovery has been, to date, a hotly contested issue.

Plaintiffs argue that the court should first decide their Motion For Class Certification. They argue first that Gayfer's "mistakenly assumes that if the Court should grant summary judgment in favor of the defendant on the plaintiffs' individual claims, the class certification issue would become moot." (Pls.' Resp. To Gayfer's Mot. To Stay at 1.) Plaintiffs cite to case law supporting the proposition that the merits of the named Plaintiffs' individual claims are not dispositive of the class claims. (Id. at 1–2; Pls.' Resp. To Defs.' Supp. Br. at 2; Pls.' Add. Resp. To Defs.' Supp. Br. at 1.) Plaintiffs also contend that class discovery is relevant to the Plaintiffs' individual claims because "[s]tatistical evidence regarding a company's general policies and practices may be critical to a showing of pretext sufficient to survive summary judgment."[4] (Pls.' Resp. To Defs.' Supp. Br. at 1.) Finally, Plaintiffs contend that "[i]f the Court should determine that the plaintiffs are not proper representatives, the Court should take measures to locate a prop-er class representative." (Pls.' Add. Resp. To Defs.' Supp. Br. at 1–2.)

In response, Defendants argue that "[s]taying class discovery, pending the resolution of the merits of the individual plaintiffs' claims, is recognized as an appropriate method of dealing with class discovery.... It is not uncommon for a Court to rule on a motion to dismiss or motion for summary judgment prior to class certification." (Defs.' Mot. To Stay Class Cert. at 2.) Defendants also argue that:

There can be no prejudice to either the named Plaintiffs or the absent putative class members from this course of action.... The named Plaintiffs' claims will have to survive a motion for summary judgment regardless of whether this case is certified as a class action, and if Defendants' motion for summary judgment is granted, the absent class members will not be bound by the judgment, since no class was ever certified. If anything, the putative class members' interests will be better served by requiring the named Plaintiffs to demonstrate the validity of their individual claims. If the named Plaintiffs cannot create a genuine issue of material fact with respect to their claims, they obviously cannot be adequate class representatives under Rule 23(a)(4).

4. In addition, although there are some cases that hold that class certification should not be delayed pending a motion for summary judgment, the motivating rationale for these cases' holdings is that the *defendant* will suffer prejudice if the motion for summary judgment is granted. Specifically, by seeking summary judgment prior to class certification, the defendant loses the opportunity to extinguish the claims of all absent class members, but the absent class members retain the ability to participate in a favorable judgment if the named Plaintiffs' claims go to trial. Preventing this "one-way intervention" is the motivating factor behind those cases that hold that class certification should not

---

4. On July 16, 1998, the Magistrate Judge overseeing discovery in this action issued an Order expanding the scope of discovery in this action. In an Order issued concurrently with this Memo-randum Opinion, the court overruled Defendants' objections to the Magistrate Judge's Order and directed the Defendants to produce the information sought.

be dependent on the merits of Plaintiffs' claims. . . .

5. However, Defendants are free to waive the potential prejudice to themselves, and it has become a common and accepted practice in many federal courts to test the named Plaintiffs' claims by a motion for summary judgment before any class certification proceedings take place. . . .

(Defs.' Supp. Br. In Supp. Of Mot. To Stay at 1–2, ¶ 3–5.)

The class action is a procedural device that serves three primary purposes. First, class actions increases judicial economy by avoiding multiple suits. *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983); *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). Second, class actions provide a method of protecting the rights of those who would not otherwise bring individual claims for practical reasons such as cost or ignorance. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *Kramer v. Scientific Control Corp.*, 534 F.2d 1085, 1091 (3d Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 90, 50 L.Ed.2d 94 (1976). Finally, the class action precludes inconsistent adjudications and assures the defendant that its liability, if any, will be determined in a single proceeding. *See First Federal of Michigan v. Barrow*, 878 F.2d 912, 919 (6th Cir.1989).

To meet these goals, Rule 23(c)(1) requires the district court to decide the issue of class certification "as soon as practicable." Fed. R.Civ.P. 23(c)(1). As the Seventh Circuit recently noted, however, in certain circumstances, it might be appropriate to rule on a motion for summary judgment before ruling on a motion for class certification. *See Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir.1995) ("It is true that Rule 23(c) of the civil rules requires certification as soon as practicable, which will usually be before the case is ripe for summary judgment. But 'usually' is not 'always,' and 'practicable' allows for wiggle room"); *see also Allen v. Aronson Furniture Co.*, 971 F.Supp. 1259, 1261 (N.D.Ill.1997) (collecting cases that support this proposition). Indeed, the vast majority of courts have held that dispositive motions may be considered prior to ruling on a motion for class certification. *See, e.g. Floyd v. Bowen*, 833 F.2d 529, 534–35 (5th Cir.1987) (noting that the rule in several circuits is that class action litigation may be halted by a Rule 12 motion to dismiss or a Rule 56 motion for summary judgment); *see also Canaday v. Kelley*, 37 F.3d 1498 (6th Cir.1994)(table, text in Westlaw); *Thompson v. County of Medina, Ohio*, 29 F.3d 238, 241 (6th Cir.1994); *Lusardi v. Xerox Corp.*, 975 F.2d 964, 983 n. 33 (3d Cir.1992); *Player v. Maher Terminals, Inc.*, 841 F.2d 1123 (4th Cir.1988) (table, text in Westlaw); *Christensen v. Kiewit–Murdock Inv. Corp.*, 815 F.2d 206, 214 (2nd Cir.1987); *Wright v. Schock*, 742 F.2d 541, 543–44 (9th Cir.1984); *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 719–20 (8th Cir.1978); *Crowley v. Montgomery Ward & Co.*, 570 F.2d 877, 879 (10th Cir.1978); *Mitchell v. Industrial Credit Corp.*, 898 F.Supp. 1518, 1537 (M.D.Ala. 1995); *Tapken v. Brown*, 1992 WL 178984 (S.D.Fla.1992). *But see Rutan v. Republican Party*, 868 F.2d 943, 947 (7th Cir.1989) (en banc) (district court's dismissal of plaintiffs' complaint for failure to state a claim without considering the issue of class certification violated Rule 23(c)(1); court considered the motion to dismiss with respect to the named plaintiffs only), *aff'd in part, rev'd in part*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *Nance v. Union Carbide Corp.*, 540 F.2d 718, 723 n. 9 (4th Cir.1976) (quoting *Peritz v. Liberty Loan Corp.*, 523 F.2d 349, 354 (7th Cir.1975)), *vacated*, 431 U.S. 952, 97 S.Ct. 2671, 53 L.Ed.2d 268 (1977); *Hutchinson v. Wickes Cos.*, 726 F.Supp. 1315, 1321–22 (N.D.Ga.1989) (noting that class certification is required prior to any determination of the merits).

■ Ruling on a dispositive motion prior to addressing class certification issues may be appropriate where there is sufficient doubt regarding the likelihood of success on the merits of a plaintiff's claims, *see Allen*, 971 F.Supp. at 1261, where inefficiency would result, *see Marx*, 747 F.2d at 1552, or where neither plaintiffs nor members of the putative class would be prejudiced. *Thompson*, 29 F.3d at 241. Further, in moving for summary judgment prior to class certification, the defendant is assuming the risk of stare decisis protection rather than the protection

of res judicata. Where the defendant seeks summary judgment knowing of the possibility that other plaintiffs will enter the case and not be bound thereby, it is not for the plaintiffs or the court to deter them from assuming that risk. *See Wright,* 742 F.2d at 541; *Schwarzschild v. Tse,* 69 F.3d 293, 297 (9th Cir.1995); *Roberts v. American Airlines, Inc.,* 526 F.2d 757, 762–63 (7th Cir.1975).

■ It is true, as Plaintiffs note, that a consideration of the merits of the named plaintiffs' claims has no bearing on the issue of class certification. In *Floyd,* the Fifth Circuit noted that:

> In *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974), the Supreme Court held that the merits underlying the dispute have no impact upon the district court's determination whether a class may properly be maintained. There the Court agreed with Judge Wisdom's conclusion in *Miller v. Mackey International, Inc.,* 452 F.2d 424, 427 (5th Cir.1971): In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.

*Floyd,* 833 F.2d at 534–35. As the *Floyd* court explained, however:

> The timing requirements of Rule 23, however, are not absolute. Professor Wright explains that "[t]he court always is empowered to make a determination on the merits irrespective of the denomination of the suit as a class action ... the propriety of that inquiry is limited only by concerns of whether the class determination should be postponed until after the merits determination." C. Wright, A. Miller, and M. Cane, 7 Federal Practice & Procedure, 1785 at 128 (footnote omitted) (1986). Indeed, as Judge Wisdom indicated in *Miller,* the class action litigation may be halted by a Rule 12 motion to dismiss or by a Rule 56 motion for summary judgment. 452 F.2d at 429. *See also, Pharo v. Smith,* 621 F.2d 656, 664 (5th Cir.), *modified on other grounds,* 625 F.2d 1226 (5th Cir. en banc 1980); *Jacobs v. Gromatsky,* 494 F.2d 513, 514 (5th Cir.1974). This is the rule in several other circuits as well. *See Marx v. Centran Corp.,* 747 F.2d 1536, 1552 (6th

Cir.1984), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985); *Wright v. Schock,* 742 F.2d 541, 543–44 (9th Cir. 1984); *Vervaecke v. Chiles, Heider & Co.,* 578 F.2d 713, 719–20 (8th Cir.1978); *Crowley v. Montgomery Ward & Co.,* 570 F.2d 877, 879 (10th Cir.1978). *But see, Finberg v. Sullivan,* 634 F.2d 50, 64 (3rd Cir.1980) (en banc). We therefore conclude that the district court did not abuse its discretion in failing to rule on the class certification issue because it ruled for the Secretary on the merits of its summary judgment motion.

*Floyd,* 833 F.2d at 534–35.

In the instant action, the court finds that the nature of the pending motions for summary judgment, the Defendants' express assumption of the risks of further litigation from putative class members, (see Defs.' Supp Br. In Supp. Of Mot. To Stay Class Disc. And Class Cert. Proceedings at 1–2, ¶ 3), and the absence of prejudice to the putative class members, all militate in favor of the court considering Defendants' Motions For Summary Judgment prior to a consideration of the Plaintiffs' Motion For Class Certification. For the reasons set forth above and below, the court will dismiss the Motion For Class Certification, without prejudice, and allow Plaintiffs to file a new motion for class certification, if necessary and appropriate.

**B. Mercantile's Motion For Summary Judgment**

Mercantile's Motion For Summary Judgment, and Plaintiffs' responsive pleadings only address the issue of whether Mercantile may properly be considered an employer of the Plaintiffs under Title VII. (*See* Mercantile's Mot. For Summ. J. at 1, ¶ 3; Mercantile's Mem. Br. In Supp. Of Its Mot. For Summ. J.; Pls.' Resp. To Mercantile's Mot. For Summ. J.) Mercantile's Motion is based on what it contends is "the lack of evidence that Mercantile controlled the employment decisions of its subsidiary, Gayfer's." (Mercantile Mot. For Summ. J. at 1.) Therefore, Mercantile argues, it "cannot be considered an employer under Title VII and Plaintiffs' attempt to pierce the corporate veil of Gay-

fer's fails as a matter of law." (*Id.* at 1–2.) Plaintiffs contend that there is "substantial evidence indicating that Gayfer's and Mercantile have sufficiently integrated operations so as to be considered a single employer for Title VII purposes. At a minimum, there is a bona-fide question of fact regarding the issue." (Pls.' Resp. To Mercantile's Mot. For Summ. J. at 1–2.)

▮ Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year." 42 U.S.C. § 2000e(b). The Eleventh Circuit has held that "[c]onsistent with the purposes of the Act we interpret the term 'employer' liberally." *Virgo v. Riviera Beach Assoc., Ltd.,* 30 F.3d 1350, 1359 (11th Cir.1994)(citing *McKenzie v. Davenport–Harris Funeral Home,* 834 F.2d 930, 933 (11th Cir.1987)); *see also Rogero v. Noone,* 704 F.2d 518 (11th Cir.1983). Where two or more corporations, such as a parent and a subsidiary, are "highly integrated with respect to ownership and operations," the corporations may be viewed as a "single employer" for purposes of establishing Title VII liability. *McKenzie,* 834 F.2d at 933 (quoting *Fike v. Gold Kist. Inc.,* 514 F.Supp. 722, 726 (N.D.Ala.), *aff'd* 664 F.2d 295 (11th Cir. 1981)); *see also Lyes v. City of Riviera Beach Florida,* 126 F.3d 1380, 1385 (11th Cir.1997), *vacated* 136 F.3d 1295 (11th Cir. 1998); *Landon v. Agatha Harden, Inc.,* 6 F.Supp.2d 1333 (M.D.Ala.1998) (DeMent, J.); *Player v. Nations Biologics, Inc.,* 993 F.Supp. 878 (M.D.Ala.1997) (DeMent, J.). If the parent corporation is found to be the "employer," it can be held liable for the acts of the subsidiary.

▮ To determine whether two corporations should be considered a "single employer" for Title VII purposes, the Eleventh Circuit has adopted standards promulgated by the National Labor Relations Board. *McKenzie,* 834 F.2d at 933. Courts are to consider the following criteria: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. *McKenzie,* 834 F.2d at 933. The second factor—whether there is centralized con-

trol of labor relations—is usually accorded greater weight than the others. *See, e.g. Fike,* 514 F.Supp. at 727; *Lyes,* 126 F.3d at 1386, 1386 n. 9 (citing Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 1310 (Paul W. Cane, et al., eds., 3d ed.1996)). After a review of the evidence in the record, and keeping in mind the liberal construction afforded the term "employer," as well as Mercantile's burden in establishing that it is entitled to summary judgment, the court finds that Mercantile has failed to meet its burden of showing that no genuine issue of material fact exists as to whether it and Gayfer's should be considered a "single employer" for purposes of Title VII.

i. Interrelation Of Operations

A review of the evidence in the record discloses that: (1) Mercantile handles Gayfer's banking operations; (2) Mercantile pays vendors supplying products to Gayfer's; (3) Mercantile retains control over Gayfer's yearly operating budget, including employee pay (minimum pay, regular pay and bonus pay); (4) Mercantile makes all of the hiring, firing, transfer and promotion decisions for senior Gayfer's employees; (5) Mercantile maintains significant ongoing contact with Gayfer's human resources managers; (6) Mercantile distributes a Handbook, as well as a multitude of other, independently issued policy statements, that set uniform policies and practices throughout Mercantile's subsidiaries, including Gayfer's; (7) Mercantile operates centralized management information services ("MIS") for it subsidiaries, including Gayfer's, that handle functions such as the preparation of paychecks for subsidiary employees and yearly EEO reports; in fact, Mercantile employees are assigned to subsidiary locations; (8) Mercantile provides centralized "risk management," including legal assistance, to its subsidiaries, and Mercantile handles any EEOC charges filed against any of its subsidiaries; (9) Mercantile's transfer policies allow subsidiary employees to transfer among Mercantile's subsidiaries without requiring new paperwork, other than local state tax forms; (10) Mercantile manages all of its subsidiaries' benefit programs, including pension and insurance plans; and (11) Mercantile provides exten-

sive training for subsidiary employees. (*See* Pls.' Resp. To Mercantile's Mot. For Summ. J. at 2–16, 27–28; Mercantile's Mem. Br. In Supp. Of Its Mot. For Summ. J. at 5–8.)

The court finds that the evidence in the record establishes that the operations of Mercantile and Gayfer's are substantially interrelated. Mercantile promulgates uniform policies and practices for all of its subsidiaries that are frequently developed after Mercantile consults with its subsidiaries. Mercantile and Gayfer's share common resources such as information management, risk management, payroll, benefits, and insurance services. Mercantile makes hiring, firing, transfer, and promotion decisions for senior Gayfer's employees, and lower level subsidiary employees can transfer among subsidiaries without encountering the administrative requirements typically associated with beginning a new job. Mercantile also handles several functions for Gayfer's, such as banking, budgeting, developing EEO reports, and paying vendors, that would ordinarily be handled by Gayfer's were it an independent company in an arm's length business relationship with Mercantile. *See McKenzie,* 834 F.2d at 933 (noting that parent controlled subsidiaries' records, issued payroll checks and paid bills); *Fike,* 514 F.Supp. at 726–27 (noting that indicia of interrelatedness include combined accounting records, bank accounts, lines of credit, payroll preparation, employee interchange, and control over the hiring and firing of each other's employees).

There is no evidence that Gayfer's reimburses Mercantile for the services it provides to Gayfer's, except for the costs of defending lawsuits, and Mercantile has failed to establish that the interrelated activities noted above are merely "mutually convenient arrangements" that could be characterized as "armslength transactions between separately organized legal entities." *Cf. Fike,* 514 F.Supp. at 727. Accordingly, the court finds that the operations of Mercantile and Gayfer's are interrelated for purposes of the first prong of the *McKenzie* test. *See further Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1362 (10th Cir.1997)(noting that the following factors can establish interrelatedness: parent keeps subsidiaries' books, issued paychecks

and paid bills, *citing McKenzie,* 834 F.2d at 933–34; parent and subsidiary shared services, equipment, employees and office space, and parent controlled subsidiary's payroll and benefit programs, *citing EEOC v. Financial Assurance, Inc.,* 624 F.Supp. 686, 689–90 (W.D.Mo.1985)).

ii. Control Of Labor Relations

The evidence in the record establishes that Mercantile exercises extensive control over many aspects of Gayfer's employment policies and practices other than hiring, promotion, transfer and some pay decisions. (*See* Mercantile's Mem. Br. In Supp. Of Mot. For Summ. J. at 2–15; Pls.' Resp. To Mercantile's Mot. For Summ. J. at 2–16, 18–27.) For example, Mercantile provides and manages life, health and disability insurance for subsidiary employees, as well as pension benefits and profit sharing plans. (Mercantile's Mem. Br. In Supp. Of Mot. For Summ. J. at 6.) Mercantile handles several of the financial aspects of its subsidiaries' labor operations, including the processing of pay information and the production of paychecks. (*Id.* at 7.) Mercantile also compiles and reports employment statistics for its subsidiaries to the federal government. (*Id.* at 8.)

Further, Mercantile provides "risk management" services for its subsidiaries; legal problems within Mercantile subsidiaries are reported to and handled by Mercantile,[5] and, importantly, employee grievances at the subsidiary level may be appealed to human resource officers at Mercantile. (*Id.* at 8; Pls.' Resp. To Mercantile's Mot. For Summ. J. at 4–5.) Mercantile also provides each subsidiary with an "Associate Handbook," prepared by Mercantile. (Pls.' Resp. To Mercantile's Mot. For Summ. J. at 5.) The Handbook contains policies and procedures governing, among other things, the length of a subsidiary employee's probationary period, advancement, scheduling, absences, parking, pay day/check cashing, appearance, personnel records, nepotism, solicitation, food and drink/smoking, loss prevention, employment status, discounts, vacations, holidays, group insurance, sick pay, benefit plans, leaves of absence, and retirement. (*Id.* at 7.)

---

5. The same counsel represent both Mercantile and Gayfer's in this action.

Mercantile has also promulgated a series of other employment related policies and practices that are utilized by Mercantile subsidiaries, and address such issues as bonuses, pay for certain work and non-work related events (i.e. jury duty, and training), and wage garnishment. (*Id.* at 8.) Although many of these policies and practices are promulgated after Mercantile consults with subsidiaries, Mercantile retains ultimate control over the substance of such policies and practices. Mercantile also develops, controls, and coordinates anti-union activity throughout all of its subsidiaries. (*See, e.g.* Pls.' Evid. In Opp. To Mercantile's Mot. For Summ. J., Ex. 4, Wilbanks Dep., Ex PD01127 (May 6, 1996 Memorandum From Lou Ripley).) In short, Mercantile exercises substantial control over many aspects of its subsidiaries' labor policies.[6]

Although Mercantile suggests that subsidiaries are free to reject any policies promulgated by Mercantile, Plaintiffs have proffered evidence that suggests otherwise, and, at the least, have raised a question of fact as to whether subsidiaries must follow all Mercantile policies, or at least some of them. (*Cf.* Mercantile's Mem. Br. In Supp. Of Its Mot. For Summ. J. at 5–6, with Pls.' Resp. To Mercantile's Mot. For Summ. J. at 8–12; 25–26.) Indeed, the evidence in the record shows that Gayfer's follows all but a handful of the policies and practices promulgated by Mercantile, and Plaintiffs have presented a multitude of Mercantile policy memorandum that are couched in mandatory rather than discretionary terms. (*See* Pls.' Resp. To Mercantile's Mot. For Summ. J. at 9–11, 13, 25–26.)

Mercantile's strongest argument is that "Human Resources directors and managers within each store, subsidiary, or each group of subsidiaries are solely responsible for hiring, supervising, firing, promoting, setting rates of pay, transferring, and setting work schedules for employees of that subsidiary or group," (Mercantile's Mem. Br. In Supp. Of Its Mot. For Summ. J. at 4), and that it "had nothing to do with the alleged employment decisions affecting" the Plaintiffs. (*Id.* at

14.) Mercantile argues that "[t]he critical question . . . is which entity made the final employment decisions regarding the persons claiming discrimination . . . [i]t defies both logic and common sense to hold a parent liable under Title VII if it did not make the alleged discriminatory decision." (*Id.* at 13.)

Even if Gayfer's management makes hiring, firing, transfer and promotion decisions for Gayfer's employees, and even if Mercantile had no input into the decisions affecting the Plaintiffs, Mercantile admits that "any employee grievance at the subsidiary or group level may be appealable to human resource officers at Mercantile. . . . The primary purpose of this appeals process is to solve employment problems without the employee having to resort to litigation." (Mercantile's Mem. Br. In Supp. Of Its Mot. For Summ. J. at 8.) Apparently then, a decision by a human resource manager at Gayfer's could be overridden by Mercantile; otherwise, the purpose of an appeals process is unclear. Mercantile has also promulgated what appears to be a uniform "Policy Against Di scrimination/Harassment," (Pls.' Evid. In Opp'n To Mercantile's Mot. For Summ. J., Ex. 1, Wilbanks Dep., Ex. CD 00006,) enforced through policies and practices dictated by Mercantile, such as its "Open Door Policy," which informs subsidiary employees that they can speak to a Mercantile manager if they do not feel comfortable speaking with a manager at their subsidiary. (*Id.*, Ex. CD00008; *see also Id.*, Ex. 2, Wilbanks Dep., Ex. PD00711.) Mercantile has also provided specific directions to its subsidiaries regarding what steps should be taken in dealing with an EEOC complaint. (*Id.*, Ex. 2, Wilbanks Dep., Ex. PD 00713.)

The evidence establishes that Mercantile *does* control most of its subsidiaries' non-hiring, firing, transfer and promotion policies, and that it *can* override decisions delegated to subsidiaries in the first instance. It also dictates anti-discrimination/harassment policies and procedures to its subsidiaries which subsidiaries must follow in making employment decisions delegated to them in the

---

**6.** The Magistrate Judge overseeing discovery in this case described the evidence presented by the Plaintiffs in opposition to Mercantile's Motion For Summary Judgment as showing that "the

employment policies which are to be implemented by each store have been developed by Mercantile." (July 16, 1998 Order, Docket # 112 at 3.)

first instance. Further, Mercantile has not presented any evidence, nor has it argued, that Gayfer's formulates and enforces its own equal employment opportunity policies. Nor has Mercantile argued that it does not provide any guidance or training to Gayfer's in complying with anti-discrimination laws. Indeed the record reflects that Mercantile provides training to Gayfer's human resource managers, who in turn train Gayfer's employees, and that Mercantile dictates anti-discrimination/harassment policies and procedures to its subsidiaries. Although actual control over the decisions at issue is important, the authority or power to control is highly relevant. *Virgo*, 30 F.3d at 1361; *but cf. Fike*, 514 F.Supp. at 727 (stating test as actual control rather than potential control).

Given the high level of control exercised by Mercantile over a wide variety of Gayfer's labor issues, the grievance process whereby subsidiary employees may appeal decisions by subsidiary managers to Mercantile officers, Mercantile's "Open Door Policy," the fact that Mercantile provides anti-discrimination/harassment policies and practices to its subsidiaries, the fact that Mercantile provides training to Gayfer's human resources managers, as well as other factors cited above, the court finds that Mercantile retains substantial control over Gayfer's labor operations for purposes of the second prong of the *McKenzie* test.[7]

### iii. Common Management

The record establishes that most of Mercantile's senior officials also hold senior management positions within Gayfer's. (*See* Pls.' Resp. To Mercantile's Mot. For Summ. J. at 2–3; 29–30; Mercantile's Mot. For Summ. J. at 4 n. 2; 17.) For example, Gayfer's board of directors is composed of: (1) D.L. Nichols, who is also the Chairman of the Board of Directors and Chief Executive Officer of Mercantile; (2) J.M. Vickers, who is also the Senior Vice–President and Chief Financial Officer of Mercantile; and (3) Robin Sanderford, who is also the Group President of the stores that compromise Mercantile Southeast. (*See* Pls.' Resp. To Mercantile's Mot. For Summ. J. at 2–3; 29–30.) Other Mercantile officers also hold high-level positions in Gayfer's.

Accordingly, the court finds that there is common management between the two companies. Cf. *Fike*, 514 F.Supp. at 727 (noting that "[c]ases treating two separate corporate entities as a single employer have placed heavy emphasis on the existence of common directors and officers," but finding no common management there because there were separate boards of directors and separate corporate officers); *Frank*, 3 F.3d at 1364 (finding no common management where there was only one common officer, and citing to cases where, as here, there were multiple common officers); *see also McKenzie*, 834 F.2d at 933 (noting common officers).

### iv. Common Ownership

It is undisputed that Gayfer's is a wholly owned subsidiary of Mercantile's.

**7.** The clear question presented by this case is whether courts must ask "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination," *see Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir.1983); *see also Frank*, 3 F.3d at 1362, or whether the four-factor test may be satisfied "by a showing that there is an amount of participation [that] is sufficient and necessary to the total employment process, even absent total control or ultimate authority over hiring decisions." *See Armbruster v. Quinn*, 711 F.2d 1332, 1338 (6th Cir.1983); *see also Cook v. Arrowsmith Shelburne, Inc. et al.*, 69 F.3d 1235, 1240 (2d Cir. 1995).

The Eleventh Circuit has not explicitly answered this question, but in *McKenzie*, the Eleventh Circuit examined all four of the factors rather than just focusing on which entity was the decision-maker. Further, the court emphasized that the "showing required to warrant a finding of single employer status has been described as 'highly integrated with respect to *ownership* and *operations*.'" *McKenzie*, 834 F.2d at 933 (*citing Fike*, 514 F.Supp. at 726).) "Ownership" does not contemplate focusing solely on the decision-making entity, nor does "operations" in its natural sense. As discussed above and as further fleshed out below, the evidence before the court shows that Mercantile and Gayfer's are "highly integrated with respect to ownership and operations". Accordingly, when the court bears in mind the "liberal" construction of the term "employer", and applies the four factors to the evidence before the court, viewed in a light most favorable to the Plaintiffs, a genuine issue of material fact exists as to whether Mercantile and Gayfer's are a "single employer" for Title VII purposes.

### v. Conclusion

Considering the four *McKenzie* factors together, *see, e.g. Frank*, 3 F.3d at 1364; *supra* note 6, the fact that "employer," as utilized in Title VII is to be construed liberally, *see McKenzie*, 834 F.2d at 933, and the remedial purposes of the statute, *see, e.g. Armbruster*, 711 F.2d at 1336, and absent express instruction from the Eleventh Circuit that the inquiry is focused solely on the decision-making entity, the court finds that Mercantile has failed to meet its burden of establishing that under the four *McKenzie* factors it is not Plaintiffs' "employer" within the meaning of Title VII. Rather, the court finds that there is a genuine issue of material fact as to whether Mercantile and Gayfer's should be considered a "single employer" for Title VII purposes, thus precluding summary judgment.

### vi. Future Proceedings

In this Memorandum Opinion And Order, the court has denied Mercantile's Motion For Summary Judgment. As noted, the only issue raised in that Motion was whether Mercantile and Gayfer's should be considered a "single employer" for Title VII purposes. Concurrent with this Memorandum Opinion And Order, the court has issued an Order overruling the Defendants' Objections to the Magistrate Judge's July 16, 1998 Order directing the Defendants to disclose certain information from the stores in the Gayfer's/J.B. White (Mercantile Southeast) Operating Group. In that Order, the court noted that the information ordered disclosed could be relevant to all of Plaintiffs' claims, especially their systemic disparate treatment and disparate impact claims. As noted, Mercantile's Motion For Summary Judgment only addressed the "single employer" issue, and Gayfer's pending Motion For Summary Judgment only addresses Plaintiffs' individual disparate treatment claims. Because the court is expanding the scope of allowable discovery, the court finds that ruling on Gayfer's pending Motion For Summary Judgment would be premature at this time. Rather, the court will allow the discovery ordered by the Magistrate Judge to proceed, and will require the Parties to submit pleadings on the Plaintiffs' systemic disparate treatment and disparate impact claims. The court will rule on the viability of all three of Plaintiffs' claims at the same time, with all relevant evidence before it. Then, if necessary and appropriate, the Plaintiffs may file a motion for class certification.

### *ORDER*

Based on the foregoing, it is CONSIDERED and ORDERED as follows:

(1) The Clerk of the Court be and the same is hereby DIRECTED to remove Mercantile's Motion To Dismiss from the pending motion's docket of this action as Mercantile withdrew its Motion on October 2, 1997;

(2) Plaintiffs' Motion To Amend The Court's Uniform Scheduling Order be and the same is hereby DENIED AS MOOT;

(3) Mercantile's Motion For An Extension Of Time To File Dispositive Motions be and the same is hereby DENIED AS MOOT;

(4) The Parties' Joint Motion To Extend Time To Disclose Expert Witnesses be and the same is hereby DENIED AS MOOT;

(5) Plaintiffs' Motion To Set Time For Response To Mercantile's Motion For Summary Judgment be and the same is hereby DENIED AS MOOT;

(6) Plaintiffs' Motion To Extend Time To Disclose Expert Witnesses be and the same is hereby DENIED AS MOOT;

(7) Plaintiffs' Motion For Class Certification be and the same is hereby DISMISSED WITHOUT PREJUDICE; Plaintiffs may renew their motion, if necessary and appropriate, following the court's ruling on all dispositive motions;

(8) Gayfer's Motion To Stay Class Certification be and the same is hereby DENIED AS MOOT;

(9) The court will refrain from ruling on Gayfer's Motion For Summary Judgment;

(10) Mercantile's Motion For Summary Judgment be and the same is hereby DENIED;

(11) Plaintiffs' Motion To Strike Gayfer's February 6, 1998 Submission Of Evidence In Support Of Reply Brief In Support Of Gayfer's Motion For Summary Judgment be and the same is hereby DENIED;

(12) Gayfer's Motion To Strike Portions Of Plaintiffs' Brief In Support Of Their Motion To Strike As An Invalid Surreply Filed Without Leave Of Court be and the same is hereby DENIED;

(13) On or before September 11, 1998, the Plaintiffs shall disclose to the Defendants any evidence, expert or otherwise, garnered from their statistical analysis based on the evidence ordered disclosed by Judge Carroll on July 16, 1998.[8]

(14) On or before October 2, 1998, the Defendants shall, if desired, file dispositive motions regarding Plaintiffs' systemic disparate treatment and disparate impact claims, as well as any additional evidence or argument they wish to file regarding Plaintiffs' individual disparate treatment claims;

(15) On or before October 23, 1998, the Plaintiffs shall, if desired, file a Response to the Defendants' dispositive motions outlined in paragraph 14;

(16) On or before November 6, 1998, the Defendants shall, if desired, file a Reply to Plaintiffs' Response outlined in paragraph 15;[9]

(17) The pretrial hearing of this matter, set for August 12, 1998, be and the same is hereby CONTINUED until December 2, 1998.

(18) The trial of this matter, set for September 21, 1998, be and the same is hereby CONTINUED until the term of court commencing February 1, 1999.

---

8. In the Order issued by the court concurrent with this Memorandum Opinion, the court directed the Defendants to produce the requested information on or before August 17, 1998.

9. Once arguments and evidence have been submitted on all of Plaintiffs' claims, the court will then determine the precise claims remaining for trial, if any.